STEVEN G. KALAR
Federal Public Defender
GALIA AMRAM PHILLIPS
Assistant Federal Public Defender
DANIEL BLANK
Assistant Federal Public Defender
CANDIS MITCHELL
Assistant Federal Public Defender
BRANDON LeBLANC
Assistant Federal Public Defender
GABRIELA BISCHOF
Assistant Federal Public Defender
450 Golden Gate Ave, 19-6884
San Francisco, CA 94102
Telephone: (415) 436-7700

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> CRYSTAL ANTHONY, <br><br> Defendant. | Case No: CR 15-005 CRB <br><br> **NOTICE OF RELATED CASE** |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> DARELL POWELL, <br><br> Defendant. | Case No. CR 15-006 WHA <br><br> **NOTICE OF RELATED CASE** |

NOTICE OF RELATED CASES
CASE NOS.  CR 15-005 CRB, CR 15-006 WHA, CR 15-027 VC, CR 15-028 CRB, CR 15-049 WHA, CR 15-050 WHA, CR 15-059 CRB, CR 15-070 VC

495929.01

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DARLENE ROUSE,<br><br>Defendant. | Case No. CR 15-0027 VC<br><br>**NOTICE OF RELATED CASE** |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ACACIA McNEAL,<br><br>Defendant. | Case No. CR 15-0028 CRB<br><br>**NOTICE OF RELATED CASE** |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON MATTHEWS,<br><br>Defendant. | Case No. CR 15-00049 WHA<br><br>**NOTICE OF RELATED CASE** |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NIJAH REED,<br><br>Defendant. | Case No. CR 15-0050 RS<br><br>**NOTICE OF RELATED CASE** |

NOTICE OF RELATED CASES
CASE NOS.  CR 15-005 CRB, CR 15-006 WHA, CR 15-027 VC, CR 15-028 CRB, CR 15-049 WHA, CR 15-050 WHA, CR 15-059 CRB, CR 15-070 VC

495929.01

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 15-0052 WHA |
| Plaintiff, | **NOTICE OF RELATED CASE** |
| v. | |
| TIANA REDDIC, | |
| Defendant. | |
| UNITED STATES OF AMERICA, | Case No. CR 15-0070 VC |
| Plaintiff, | **NOTICE OF RELATED CASE** |
| v. | |
| SHOLANDA ADAMS, | |
| Defendant. | |

NOTICE OF RELATED CASES
CASE NOS.  CR 15-005 CRB, CR 15-006 WHA, CR 15-027 VC, CR 15-028 CRB, CR 15-049 WHA, CR 15-050 WHA, CR 15-059 CRB, CR 15-070 VC

495929.01

# NOTICE OF RELATED CASE

## I. INTRODUCTION

For the last two years, a San Francisco Police Department (SFPD) and Drug Enforcement Agency (DEA) taskforce called "Operation Safe Schools" has done annual sweeps of the Tenderloin neighborhood in San Francisco.  The focus of Operation Safe Schools is on very low-level street dealers of crack, with an occasional seller of heroin or OxyContin included.  The deals all involve the smallest amounts of drugs commonly sold, such as one rock of crack.  If charged at all, these sales amounts are almost always charged in state court.[1]  But the persons targeted by the SFPD and the DEA in Operation Safe Schools have all been charged in the federal court in San Francisco where they face a one-year mandatory-minimum sentence under 21 U.S.C. § 860.  In total, thirty-seven people have been targeted by the SFPD/DEA Operation Safe Schools taskforce.  Every single one is Black.

This statistic alone is cause for grave concern.  Dr. Sheigla Murphy, a sociologist who specializes in studying controlled substance abuse in San Francisco, reports in a Declaration attached to this Notice that other races do, in fact, sell controlled substances in the Tenderloin.  Moreover, the concerns raised by the statistical disparity are compounded by the recently revealed evidence of racial bias by SFPD officers against African-Americans.  *See* Kale Williams, *SFPD probes racist, homophobic texts among officers,* SFGATE, March 16, 2015, *at* http://www.sfgate.com/bayarea/article/SFPD-probes-racist-homophobic-texts-among-6133753.php (noting that an SFPD officer described a person as a "monkey" and, while referring to that same person, stating it is not "against the law to put an animal down")  The racial bias revealed in these texts appears in Operation Safe Schools as well:  in one of the videos of the

---

[1] All the Operation Safe Schools defendants who have been sentenced, and for whom the Federal Public Defender was able to review the PSR, had Base Offense Levels corresponding to 1.4g of crack cocaine – the lowest possible level.  Statistics from the United States Sentencing Commission show that nationally only 2.4% of crack offenders had a Base Offense Level of 12 in 2013.  In the five years preceding Operation Safe Schools, only two people in the Northern District of California, who were sentenced for trafficking in crack cocaine, had base offense levels of 12 (for a rate of 1.2% of offenders).

**NOTICE OF RELATED CASES**

1

Operation Safe Schools cases, produced in discovery in *United States v. McNeal,* No. 15-028 CRB, while the camera is trained on a group of two Black women and two Black men, a law enforcement officer is heard loudly stating "fucking BMs," after which another officer says, in reference to the filming, "shh, hey, I'm rolling."

In light of the evidence of selective enforcement and prosecution arising from Operation Safe Schools, the defendants in all the above-captioned cases intend to file a motion to dismiss. For the reasons stated below, and in order to not waste judicial resources by having four different judges hear the exact same motion, the defendants file this Notice of Related Case.

## II. FACTS

### A. Overview of Operations Safe Schools

Operation Safe Schools is a partnership between the United States Attorney's Office, the SFPD and the DEA. Declaration of Galia Phillips In Support Of Notice Of Related Case ("Phillips Decl."), Att. C [2.12.15 USAO Press Release]. The stated goal of Operation Safe Schools is to "use the law enforcement tools available to [the government] to make neighborhoods like the Tenderloin safe, and to ensure that children who live and go to school in these neighborhoods are not exposed to crime and drug dealing." *Id.* Thus far, Operation Safe Schools consists of two sweeps of the Tenderloin neighborhood in San Francisco, CA.[2] The first sweep was between August and November 2013, and the second sweep between October and December 2014. Declaration of Sheree Cruz-Laucirica In Support Of Notice Of Related Case ("Laucirica Decl."), Att. D [Spreadsheet of Operation Safe Schools cases].

People arrested pursuant to Operation Safe Schools were charged in the San Francisco division of the United States District Court for the Northern District of California. Each defendant was charged with selling drugs within 1000 feet of a school in violation of 21 U.S.C. §§ 841 and 860. The DEA/SFPD taskforce arrested fourteen people pursuant to Operation Safe

---

[2] The underlying events in two of the cases, *United States v. Lakesha White,* 15-029 EMC, and *United States v. William Brown,* 15-069 TEH, actually occurred one block out of the Tenderloin neighborhood. However, the police reports in both cases state that the events took place in the Tenderloin. Davalos Decl., ¶3.

NOTICE OF RELATED CASES

2

1   Schools in the 2013 sweep, and twenty-three people in the 2014 sweep.  Laucirica Decl., Att. K.
2   All thirty-seven people arrested by the DEA/SFPD in Operation Safe Schools are Black.  *Id.* at ¶
3   3.
4       Dr. Sheigla Murphy, a sociologist and the Director of the Center for Substance Abuse
5   Studies at the Institute for Scientific Analysis, has studied drug users and drug sales in the San
6   Francisco Bay Area for 35 years.  Declaration of Sheigla Murphy In Support Of Notice Of
7   Related Case ("Murphy Decl."), ¶2.  She is familiar with the population of drug sellers who work
8   in San Francisco's Tenderloin neighborhood, and has conducted ethnographic studies of drug
9   sales, including hundreds of life history interviews with Bay Area drug sellers.  In the course of
10  her work, she has learned that drug sellers come from a variety of racial and ethnic backgrounds.
11  This is particularly true for those who sell in the Tenderloin neighborhood.  *Id.*[3]

### B.   How The DEA/SFPD Conducted Operation Safe Schools

15      The facts underlying all the Operation Safe Schools cases are similar.[4]  For the 2013
16  sweep, the majority of the cases used an undercover informant named "Jimmy" who bought
17  drugs from the targets.  The transactions were recorded using a body camera.  For the 2014
18  sweep, the DEA/SFPD used video surveillance of the designated target.  In the videos, it appears
19  the officers were stationed on either a nearby rooftop or a building observing, and taking video
20  of, a specific area of the Tenderloin in which drug selling was allegedly occurring.  The officers
21  can oftentimes be heard on the video pointing out the target of the operation.  Declaration of
22  Cary Davalos In Support Or Notice Of Related Case, ("Davalos Decl."), ¶2.  Once the target of
23  the operation was identified on video, the officers executed one of two approaches.  Either an
24  undercover officer, sometimes wearing a body camera, bought a small amount of illegal

---

[3] Dr. Murphy provides this expert opinion based on her years of experience.  She needs to conduct further studies in order to substantiate the diversity in racial backgrounds of persons engaged in drug sales in San Francisco's Tenderloin neighborhood.  Murphy Decl., ¶2.

[4] The reports from the above-captioned Operation Safe Schools cases are attached as Attachment H of the Phillips Decl.

**NOTICE OF RELATED CASES**

3

1   narcotics from the target, or the officers videotaped a few apparent hand to hand transactions
2   between the target and alleged drug buyers, stopped an alleged buyer soon after an apparent hand
3   to hand transaction, and seized illegal narcotics from the buyer.  Davalos Decl., ¶2.
4         The majority of the targets were not arrested on the day of these operations.  Rather, the
5   DEA/SFPD typically made no contact with the targets, but instead arrested them on a later date
6   on federal arrest warrants and brought them directly to federal court.  Laucirica Decl., ¶4.  Most
7   of the Operation Safe Schools cases were generated by the same DEA and SFPD officers.  For
8   example, as the attached graphs show, seven officers were involved in at least 20 of the 37 cases.
9   One officer was involved in 30 of the 37 cases, while a second officer was involved in 29 cases.
10  Declaration of Rob Ultan In Support of Notice Of Related Case, ¶¶2-3; Declaration of August
11  Sommerfeld In Support Of Notice Of Related Case, Att. A [graphs showing officer
12  involvement].
13        In the video produced in discovery in *United States v. Cassie Roberts,* No. 13-760 CRB,
14  the undercover informant tries to buy drugs from Ms. Roberts, a Black woman.  Ms. Roberts,
15  who is on the phone, doesn't respond initially.  An Asian woman approaches the confidential
16  informant and offers to sell drugs, but the informant declines and waits for Ms. Roberts to get off
17  of the phone.  Phillips Decl., Att. G (recording the informant buying the drugs and later
18  explaining to the agents that Ms. Roberts was not paying attention to him [the informant], but he
19  got her attention and avoided the "Asian chick" by saying he wants the "good shit.").
20        Also, as noted above, in the video produced in *United States v. Acacia McNeal,* No. 15-
21  028 CRB, while the camera is trained on a group of two Black women and two Black men, a law
22  enforcement officer is heard loudly stating "fucking BMs." Phillips Decl., Att. F.  Immediately
23  after this exclamation, another officer warns, in an apparent reference to the running video, "shh,
24  hey, I'm rolling."  *Id.*   The government has not yet revealed which officer made the "fucking
25  BM" comment, nor which officer said "shh, hey, I'm rolling." Notably, however, the officers in
26  the *McNeal* case also worked on at least 29 other Operation Safe School cases.  Ultan Decl., ¶¶2-
27  3.  In addition, the U.S. Attorney's Office recently revealed racist text messages involving at
28

NOTICE OF RELATED CASES

4

least four SFPD officers. Phillips Decl., Att. I [Docket No. 247-1 in *United States v. Furminger,* No. 14-102 CRB].

Finally, though the stated goal of Operation Safe Schools is "to ensure that children who live and go to school … are not exposed to crime and drug dealing," Phillips Decl., Att. C, the Operation was not focused on the high drug-incident report areas near San Francisco public schools.[5] Sommerfeld Decl., Att. B [graphs].

### C. The Quantity Of Drug Involved In The Operation Safe School Cases

In almost all the Operation Safe Schools cases, the quantity of drugs involved was minimal. For example, of the 2013 Operation Safe Schools cases in which the client was represented by the Federal Public Defender (and thus the defense was able to examine the PSR or the plea agreement), the Base Offense Level used for the natural guideline calculations was the lowest possible level, level 12 - reflecting the lowest possible quantity of drugs (less than 1.4 grams in the case of crack cocaine).[6] Declaration of Megan Wallstrum In Support Of Notice Of Related Case, ¶2.

Typically, drug cases involving this small quantity of drugs are not charged in federal court, and - prior to Operation Safe Schools - rarely charged in the Northern District of California. Statistics from the United States Sentencing Commission show that nationally only 2.4% of crack offenders had a Base Offense Level of 12 in 2013. In the Ninth Circuit that rate was 2.5%. In the five years preceding Operation Safe Schools, only two people in the Northern District of California, who were sentenced for trafficking in crack cocaine, had base offense levels of 12 (for a rate of 1.2% of offenders). Phillips Decl., Att. E.[7]

---

[5] At this time, the defense only has data for San Francisco's public schools, and the attached graphs do not address private schools.

[6] In some of the PSRs, the Base Offense Level was calculated at Level 14 because the two-point increase in §2D1.2 for selling drugs within 1000 feet of a protected location was included in the Base Offense Level. However, the level corresponding to the amount of drugs was always 12. Wallstrum Decl., ¶2.

[7] In fact, the Central District of California and the District of Columbia have both stated that they generally do not prosecute crack cases involving less than 50 grams of crack. Phillips Decl., Att. J at 16 [United States Sentencing Commission Report on Cocaine and Federal Sentencing

NOTICE OF RELATED CASES

5

## III.  ARGUMENT

### A.  Standard For Relating Cases

Under Criminal Local Rule 8-1, any "pending criminal action is related to another civil or criminal action when: … (2) [b]oth actions appear likely to entail substantial duplication of labor if heard by different Judges or might create conflicts and unnecessary expenses if conducted before different Judges."  In filing a Notice of Related Case, a party must explain whether "assignment to a single Judge is or is not likely to conserve judicial resources and promote an efficient determination of the action."  N.D. Cal. Crim. L. Rule 8-1(c)(4).

The Notice of Related Case must be filed with the judge assigned to the earliest-filed case.  That judge then decides if the cases are related and whether the later-filed case shall be reassigned to the judge with the earliest-filed case.  *Id.* at 8-1(e).  Here, the first-filed case in which the selective enforcement motion will be filed is *United States v. Crystal Anthony,* 15-005 CRB.[8]  Notably, this Court has already related 15-CR-005 to an even-earlier filed case, *United States v. Crystal Anthony,* 08-569 CRB.

### B.  Under Local Rule 8-1, The Above-Captioned Cases Should Be Related Because The Selective Enforcement Motion Will Involve Substantial Duplication Of Labor And Might Result In Inconsistent Orders

#### i.  Standard for Selective Enforcement Motions

At this early stage of the proceedings, it is not clear if the equal protection violation arises from selective enforcement or selective prosecution.  In one informative case, Judge Fogel observed that the applicable legal standard depends on whether the issue is selective enforcement by law enforcement officers or selective prosecution by the United States Attorney's Office.  *Rodriguez v. California Highway Patrol,* 89 F.Supp.2d 1131, 1141 (N.D. Cal. 2000).  With

---

Policy].  The Operation Safe School cases which, as explained above, have a Base Offense Level of 12, involve less than 1.4g of crack cocaine.  Wallstrum Decl., Att. L; U.S.S.G. §2D1.1.

[8] It also bears emphasis that this motion is based on the selective enforcement in all Operation Safe Schools cases, open and closed.  This Court also presided over the first Safe Schools case, *United States v. Alfred Craney,* No. 13-752 CRB.  Laucricia Decl., Att. K.

NOTICE OF RELATED CASES

1   either basis, the first step is meeting the standard for discovery from the U.S Attorney's Office,

2   the DEA and the SFPD related to Operation Safe Schools.  If the issue is selective prosecution,

3   then under *United States v. Armstrong,* 517 U.S. 456, 469 (1996), in order to obtain discovery,

4   the defense must show make "a credible showing of different treatment of similarly situated

5   persons."  *Id.*  In other words, the defense must "produce some evidence that similarly situated

6   defendants of other races could have been prosecuted, but were not."  *Id.*

7         This showing may be satisfied by statistical proof.  In *United States v. Tuitt,* 68 F.Supp.2d

8   4, 9 (D. Mass. 1999), the court found the defense made a sufficient showing to obtain discovery

9   based only on the statistical disparity between the race of defendants charged in federal court

10  with selling crack cocaine (all Black) and those charged in state court (57 % Black).  In so

11  holding, the court noted that the "evidence more than speaks for itself," that even the government

12  acknowledged "that the evidence could 'raise an eyebrow,'" and that "more importantly, the

13  information provided by Defendant, unlike that provided in *Armstrong*, is not anecdotal or

14  confined to statistics arising out of the federal district itself.  Rather, Defendant has also

15  undertaken a comprehensive survey of the local state courts in order to provide an appropriate

16  comparison."  *Id.*

17        If the issue is selective enforcement, the standard for discovery is not clear.  But as Judge

18  Fogel persuasively explained, the "presumption of regularity" that supports prosecutorial

19  decisions and results in "special deference to the prosecutorial office," does not apply.

20  *Rodriguez,* 89 F.Supp.2d at 1141.  As a result, "[c]ourts have recognized the possibility that

21  officers in the field occasionally may abuse their discretion and selectively target specific groups

22  and individuals on the basis of race or other illegitimate factors."  *Id.* (internal citations omitted).

23  This motion to consolidate these cases is not the appropriate forum to litigate the merits of the

24  defendants' equal protection and discovery claims.  As described more fully below, however, the

25  legal issues underlying these claims would be more efficiently resolved by one court.

26

27

28

**NOTICE OF RELATED CASES**

7

### ii. The Labor Involved In The Selective Enforcement Motion

In order to meet the applicable standard for obtaining discovery to support either a selective enforcement or selective prosecution claim, the defense will need to undertake significant, costly, and time-consuming work. In consultation with sociologists, the defense has identified three possible studies: 1) a survey of users at needle exchange sites to determine the race of the users' seller; 2) an ethnographic study of open-air drug markets, and 3) comparison of the race of defendants charged with selling drugs in state court versus those charged in federal court pursuant to Operation Safe Schools. The defense will also need to consult with expert witnesses on the drug trade in the areas at issue in Operation Safe Schools. Phillips Decl., ¶2.

In addition, the defense will need to investigate the evidence of racial bias revealed in the San Francisco Police Department texts and at least one video of the Operation Safe Schools investigations. *See supra* at 3-4.

### iii. Because of the labor involved with the selective enforcement motion, the simplicity of the cases otherwise, and the need to avoid multiple conflicting orders, the Court should relate the cases.

Here, both factors in Local Rule 8-1(2) favor relating the Safe Schools cases. First, relating the cases will avoid having multiple, and possibly conflicting, orders on the various selective enforcement motions. Second, relating the cases will prevent the duplication of judicial labor that would result if all four judges with pending cases in which the motion will be filed preside over the same litigation. This litigation is substantial: the discovery motion alone will involve numerous expert witnesses, likely two different sociological studies, extensive record collection, and statistical analysis. The litigation will also involve substantial briefing on legal issues, some of which – such as the standard for discovery on a selective enforcement motion – have not been addressed by higher courts.

Notably, while the judicial resources needed to resolve the selective enforcement motion are considerable, the cases themselves are otherwise very simple and remarkably factually similar. The cases all involve one taskforce, many of the same law enforcement officers, the

**NOTICE OF RELATED CASES**

8

1  same charge, the same neighborhood, and similar facts.  All the cases also involve a minimal
2  amount of drugs and similar guideline calculations.  *See supra,* at 4.  Assignment to a single
3  judge is therefore practical as well as necessary to "conserve judicial resources and promote an
4  efficient determination of the action."  Local Rule 8-1(c)(4).

## IV.  CONCLUSION

For the foregoing reasons, the defendants in the above-captioned cases respectfully ask the Court to relate their cases.

Dated:  March 30, 2015

By: */s/ Galia Amram Phillips*
    GALIA A. PHILLIPS
    Attorney for Defendants Reed, Reddic and Rouse

Dated:  March 30, 2015

By: */s/ Brandon LeBlanc*
    BRANDON LeBLANC
    Attorney for Defendant Matthews

Dated:  March 30, 2015

By: */s/ Candis Mitchell*
    CANDIS MITCHELL
    Attorney for Defendant Adams

**NOTICE OF RELATED CASES**

9

Dated: March 30, 2015

By: */s/ Gabriela Bischof*
GABRIELA BISCHOF
Attorney for Defendant Powell

Dated: March 30, 2015

By: */s/ Daniel P. Blank*
DANIEL P. BLANK
Attorney for Defendants Anthony and McNeal

**NOTICE OF RELATED CASES**