STEVEN G. KALAR
Federal Public Defender
GALIA AMRAM PHILLIPS
Assistant Federal Public Defender
DANIEL BLANK
Assistant Federal Public Defender
CANDIS MITCHELL
Assistant Federal Public Defender
BRANDON LeBLANC
Assistant Federal Public Defender
GABRIELA BISCHOF
Assistant Federal Public Defender
450 Golden Gate Ave, 19-6884
San Francisco, CA 94102
Telephone: (415) 436-7700

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CRYSTAL ANTHONY,<br><br>Defendant. | Case No: CR 15-005 CRB<br><br>**DECLARATION OF GALIA A. PHILLIPS IN SUPPORT OF NOTICE OF RELATED CASE** |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DARELL POWELL,<br><br>Defendant. | Case No. CR 15-006 WHA<br><br>**DECLARATION OF GALIA A. PHILLIPS IN SUPPORT OF NOTICE OF RELATED CASE** |

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 15-0027 VC |
| Plaintiff, | **DECLARATION OF GALIA A.** |
| | **PHILLIPS IN SUPPORT OF NOTICE OF** |
| v. | **RELATED CASE** |
| DARLENE ROUSE, | |
| Defendant. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 15-0028 CRB |
| Plaintiff, | **DECLARATION OF GALIA A.** |
| | **PHILLIPS IN SUPPORT OF NOTICE OF** |
| v. | **RELATED CASE** |
| ACACIA McNEAL, | |
| Defendant. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 15-00049 WHA |
| Plaintiff, | **DECLARATION OF GALIA A.** |
| | **PHILLIPS IN SUPPORT OF NOTICE OF** |
| v. | **RELATED CASE** |
| AARON MATTHEWS, | |
| Defendant. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 15-0050 RS |
| Plaintiff, | **DECLARATION OF GALIA A.** |
| | **PHILLIPS IN SUPPORT OF NOTICE OF** |
| v. | **RELATED CASE** |
| NIJAH REED, | |
| Defendant. | |

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 15-0052 WHA |
| Plaintiff, | **DECLARATION OF GALIA A. PHILLIPS IN SUPPORT OF NOTICE OF RELATED CASE** |
| v. | |
| TIANA REDDIC, | |
| Defendant. | |
| UNITED STATES OF AMERICA, | Case No. CR 15-0070 VC |
| Plaintiff, | **DECLARATION OF GALIA A. PHILLIPS IN SUPPORT OF NOTICE OF RELATED CASE** |
| v. | |
| SHOLANDA ADAMS, | |
| Defendant. | |

495929.01

**<u>DECLARATION OF GALIA AMRAM PHILLIPS IN SUPPORT OF NOTICE OF</u>**

**<u>RELATED CASE</u>**

I, GALIA AMRAM PHILLIPS, declare and state that:

1.  I am an attorney at law duly admitted to practice in the State of California and admitted to the bar of this Court.  I represent the defendant in the above-captioned matter. Unless otherwise noted, I make this declaration based on my own personal knowledge. With respect to those matters not personally known to me I make this declaration upon information and belief.

2.  In order to meet the applicable standard for obtaining discovery to support either a selective enforcement or selective prosecution claim, the defense needs to undertake significant, costly, and very time-consuming work.  In consultation with sociologists, the defense has identified three possible studies:  1) a survey of users at needle exchange sites to determine the race of the users' seller; 2) an ethnographic study of open-air drug markets, and 3) comparison of the race of defendants charged with selling drugs in state court versus those charged in federal court pursuant to Operation Safe Schools.  The defense will also need to consult with expert witnesses on the drug trade in the areas at issue in Operation Safe Schools.

3.  Attached hereto as Attachment C is a true and correct copy of a 12.09.2013 Press Release by the United States Attorney's Office.

4.  Attached hereto as Attachment D is a true and correct copy of a 02.12.2015 Press Release by the United States Attorney's Office.

5.  Attached hereto as Attachment E is a true and correct copy of reports from the United States Sentencing Commission's Interactive Sourcebook on the different Base Offense Levels for amounts of controlled substances in federal criminal cases in 2013.  One report shows the nationwide statistics, the second report shows the statistics for the Ninth Circuit, and the third report shows the statistics for the Northern District of California between 2009-2013.

**DECLARATION IN SUPPORT OF NOTICE OF RELATED CASES**

6. Attached hereto as Attachment F is a true and correct copy of a video produced in discovery in *United States v. Acacia McNeal.* No. 15-028 CRB.

7. Attached hereto as Attachment G is a true and correct copy of a video produced in discovery in *United States v. Cassie Roberts,* No. 13-CR-760 CRB.

8. Attached hereto as Attachment H are the reports provided in discovery for all the Operation Safe Schools cases in which the defendant was represented by the Office of the Federal Public Defender.

9. Attached as Attachment I is a true and correct copy of the Declaration of Special Agent Tyler Nave In Support Of Government's Opposition To Defendant Furminger's Motion For Bail Pending Appeal, Docket No. 247-1 in *United States v. Furminger,* No. 14-102 CRB.

10. Attached as Attachment J is a true and correct copy of a United States Sentencing Commission Report on Cocaine and Federal Sentencing Policy.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on March 24, 2015, in San Francisco, CA.

  /s Galia A. Phillips

Galia Amram Phillips

Attachment C


United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE
# NORTHERN DISTRICT *of* CALIFORNIA

U.S. Attorneys » Northern District of California

Department of Justice

U.S. Attorney's Office

Northern District of California

FOR IMMEDIATE RELEASE　　　　　　　　　Monday, December 9, 2013

# U.S. Attorney Tackles Drug Dealing Around Schools In Tenderloin

SAN FRANCISCO – Ten individuals have been indicted by a federal grand jury on charges of drug trafficking within 1,000 feet of schools in San Francisco's Tenderloin District, United States Attorney Melinda Haag and DEA Special Agent in Charge Jay Fitzpatrick, announced.

The ten individuals are:

1. Alfred Craney, United States v. Craney, CR-13-0752-CRB
2. Ivan Speed, United States v. Speed, CR-13-0753-EMC
3. Latoya Jackson, United States v. Jackson, CR-13-0754-THE
4. Angela Jones, United States v. Jones, CR-13-0755-RS
5. Saquita Nash, United States v. Nash, CR-13-00757-THE
6. Mellina Williams, United States v. Williams, CR-13-00758-WHO
7. Shaneka Clay, United States v. Clay, CR-13-00759-RS
8. Cassie Roberts, United States v. Roberts, CR-13-00760-CRB
9. Jamesha Harris, United States v. Harris, CR-13-00761-CRB
10. Lori Spiller, United States v. Spiller, CR-13-00768-WHO

According to the charging documents, the defendants are each charged in separate, one-count indictments alleging that they dealt cocaine base in the form of "crack" cocaine within 1,000 feet of elementary schools in the Tenderloin, in violation of 21 U.S.C. § 841(a)(1) and 860.

According to Haag, the cases are part of an ongoing relationship between her office, the U.S. Drug Enforcement Administration, the San Francisco Police Department, and the Tenderloin community. "There are thousands of children who live and go to school in the Tenderloin District," commented United States Attorney Melinda Haag. "Those children deserve the same chance as children who live in other neighborhoods around San Francisco: the chance to go to and from school without having to navigate through crack deals on the way. That is why I have directed my office to work with the DEA and the San Francisco Police Department to aggressively prosecute drug trafficking

in areas around Tenderloin schools."

Haag stressed that more charges could be on the way. "Everyone who treats the Tenderloin as an open-air drug market should be on notice: law enforcement is paying attention. You won't know when the next arrests will be, or which schools or street corners we'll focus on next, but if you're caught you will face significant time in federal custody."

"DEA is committed to making San Francisco a safe place for the children and families who live here, and the citizens who work in or visit this great city. We are pleased to have partnered with the San Francisco Police Department and the US Attorney's Office to bring Federal charges against these defendants. We hope these arrests send a clear message that we won't tolerate drug trafficking in any of our neighborhoods," said Jay Fitzpatrick, DEA Special Agent in Charge.

The ten defendants who have been indicted so far have all been arrested and arraigned in federal court in San Francisco, with the exception of Craney, who, according to prosecutors, is currently in state custody on unrelated charges.

The maximum statutory penalty for violating the federal drug-free school zone statute is 40 years in prison, with a minimum mandatory one year in jail, at least six years and up to life on supervised release, and a maximum fine of up to $2,000,000. However, any sentence following conviction would be imposed by the court after consideration of the U.S. Sentencing Guidelines and the federal statute governing the imposition of a sentence, 18 U.S.C. § 3553.

The prosecutions are the result of multiple investigations by the San Francisco Police Department, the San Francisco Field Division of the U.S. Drug Enforcement Administration and the United States Attorney's Office for the Northern District of California.

Please note, an indictment contains only allegations against an individual and, as in all cases, the defendants listed above must be presumed innocent unless and until proven guilty.

---

**USAO - California, Northern District**

Updated November 18, 2014

Attachment D



United States Department of Justice

## THE UNITED STATES ATTORNEY'S OFFICE
## NORTHERN DISTRICT *of* CALIFORNIA

<u>U.S. Attorneys</u> » <u>Northern District of California</u>

Department of Justice

U.S. Attorney's Office

Northern District of California

FOR IMMEDIATE RELEASE                       Thursday, February 12, 2015

# Law Enforcement Tackles Drug Sales Near Schools In San Francisco

SAN FRANCISCO – U.S. Attorney Melinda Haag, Drug Enforcement Agency, Acting Special Agent in Charge Bruce Balzano, and San Francisco Police Chief Greg Suhr announced that 19 people have been indicted by a federal grand jury on charges of drug trafficking near schools and playgrounds in San Francisco. The indictments and arrests resulted from a continued partnership between the U.S. Attorney's Office, the DEA, and the San Francisco Police Department in a program called Operation Safe Schools.

This iteration of Operation Safe Schools focused on the Tenderloin neighborhood and portions of the South of Market neighborhood, two areas notorious for drug dealing in San Francisco. In announcing the charges, U.S. Attorney Melinda Haag stressed the significance of protecting school zones. "The goal of Operation Safe Schools is to use the law enforcement tools available to us to make neighborhoods like the Tenderloin safe, and to ensure that children who live and go to school in these neighborhoods are not exposed to crime and drug dealing," said U.S. Attorney Haag. "We intend to continue with this initiative and others like it until the children in our community are no longer exposed to these dangerous situations."

According to Acting Special Agent in Charge Bruce Balzano, the DEA will continue to partner with other law enforcement agencies to protect children and schools from drug trafficking. "These partnerships are important because they allow us to better protect our communities. The Safe Schools program delivers an important message to drug dealers who do business in the Northern District of California: We will not tolerate drug trafficking in school zones or anywhere else," said Acting SAC Balzano.

"I wish to thank the US Attorney's Office and DEA for their continued partnership with the San Francisco Police Department and their commitment to Operation Safe Schools," said San Francisco Police Chief Suhr. "Together, we are making a difference in the lives of all residents in the Tenderloin area by preventing drug dealers from preying on young children near the schools they attend on a daily basis. Every child deserves an education and should not ever have to

navigate drug dealers to get to school."

Over the past nine days, the following defendants have been arrested and brought before U.S. Magistrate Judges to answer charges:

- Sholanda Adams       Case No. CR-15-0070 VC
- Crystal Anthony       Case No. CR-15-0005 SI
- William Brown       Case No. CR-15-0069 TEH
- Latonya Carey       Case No. CR-15-0004 MMC
- Jahnai Carter       Case No. CR-14-0642 MMC
- Tiffany Cross       Case No. CR-15-0059 CRB
- Holbert Lee       Case No. CR-15-0056 EMC
- Aaron Mathews       Case No. CR-15-0049 WHA
- Vernon Hill, AKA Kali Muhammed Case No. CR-15-0068 CRB
- Mathew Mumphrey       Case No. CR-14-0643 RS
- Andre Patterson       Case No. CR-14-0642 MMC
- Ashley Pharr       Case No. CR-15-0007 CRB
- Darell Powell       Case No. CR-15-0006 WHA
- Tiana Reddic       Case No. CR-15-0052 WHA
- Nijah Reed       Case No. CR-15-0050 RS
- Darlene Rouse       Case No. CR-15-0027 VC
- Irisha Smith       Case No. CR-14-0641 WHA
- Ebony Wallace       Case No. CR-15-0061 CRB
- Lakeysha White       Case No. CR-15-0029 EMC

According to the charging documents, the defendants are each charged with the distribution of prohibited drugs on or within 1,000 feet of a school or playground, in violation of 21 U.S.C. §§ 841(a)(1) and 860. The defendants are charged with distributing various controlled substances, including "crack" cocaine, heroin, methamphetamine, and oxycodone, as specified in the individual indictments.

The maximum statutory penalty for violating the drug-free school zone statute is 40 years in prison, with a mandatory minimum sentence of one year in jail, at least six years and up to life on supervised release, and a maximum fine of up to $2,000,000. However, any sentence following conviction would be imposed by the court after consideration of the U.S. Sentencing Guidelines and the federal statute governing the imposition of a sentence, 18 U.S.C. § 3553.

Sarah Hawkins and Lloyd Farnham are the Assistant U.S. Attorneys prosecuting these cases. The prosecutions are the result of multiple investigations by the San Francisco Police Department, the San Francisco Field Division of the U.S. Drug Enforcement Administration (DEA) and the United States Attorney's Office for the Northern District of California.

Please note, an indictment contains only allegations and, as in all cases, the defendants listed above must be presumed innocent unless and until proven guilty.

USAO - California, Northern District

Updated February 13, 2015

Attachment E

# BASE OFFENSE LEVELS IN EACH DRUG TYPE FOR DRUG TRAFFICKING CASES[1]
## Fiscal Year: 2013
### Circuit: 9th Circuit

| Base Offense Level | Total | Powder Cocaine | | Crack Cocaine | | Heroin | | Marijuana | | Metham- phetamine | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| Total | 4,600 | 514 | 11.2 | 119 | 2.6 | 335 | 7.3 | 1,467 | 31.9 | 1,985 | 43.2 | 180 | 3.9 |
| 12 | 36 | 12 | 2.3 | 3 | 2.5 | 0 | 0.0 | 7 | 0.5 | 10 | 0.5 | 4 | 2.2 |
| 14 | 30 | 5 | 1.0 | 1 | 0.8 | 2 | 0.6 | 19 | 1.3 | 2 | 0.1 | 1 | 0.6 |
| 16 | 157 | 2 | 0.4 | 2 | 1.7 | 4 | 1.2 | 135 | 9.2 | 7 | 0.4 | 7 | 3.9 |
| 18 | 431 | 10 | 1.9 | 1 | 0.8 | 7 | 2.1 | 377 | 25.7 | 17 | 0.9 | 19 | 10.6 |
| 20 | 219 | 7 | 1.4 | 2 | 1.7 | 5 | 1.5 | 176 | 12.0 | 8 | 0.4 | 21 | 11.7 |
| 22 | 136 | 6 | 1.2 | 5 | 4.2 | 6 | 1.8 | 101 | 6.9 | 11 | 0.6 | 7 | 3.9 |
| 24 | 181 | 8 | 1.6 | 6 | 5.0 | 7 | 2.1 | 137 | 9.3 | 11 | 0.6 | 12 | 6.7 |
| 26 | 700 | 66 | 12.8 | 58 | 48.7 | 82 | 24.5 | 292 | 19.9 | 168 | 8.5 | 34 | 18.9 |
| 28 | 225 | 30 | 5.8 | 14 | 11.8 | 35 | 10.4 | 53 | 3.6 | 77 | 3.9 | 16 | 8.9 |
| 30 | 424 | 113 | 22.0 | 7 | 5.9 | 53 | 15.8 | 100 | 6.8 | 138 | 7.0 | 13 | 7.2 |
| 31 | 254 | 63 | 12.3 | 0 | 0.0 | 26 | 7.8 | 3 | 0.2 | 160 | 8.1 | 2 | 1.1 |
| 32 | 521 | 111 | 21.6 | 12 | 10.1 | 59 | 17.6 | 55 | 3.7 | 259 | 13.0 | 25 | 13.9 |
| 33 | 206 | 4 | 0.8 | 2 | 1.7 | 17 | 5.1 | 1 | 0.1 | 181 | 9.1 | 1 | 0.6 |
| 34 | 682 | 56 | 10.9 | 2 | 1.7 | 24 | 7.2 | 8 | 0.5 | 581 | 29.3 | 11 | 6.1 |
| 36 | 172 | 8 | 1.6 | 4 | 3.4 | 5 | 1.5 | 3 | 0.2 | 147 | 7.4 | 5 | 2.8 |
| 38 | 226 | 13 | 2.5 | 0 | 0.0 | 3 | 0.9 | 0 | 0.0 | 208 | 10.5 | 2 | 1.1 |

[1] Of the 18,883 cases, 4,829 were sentenced under §2D1.1 (Drug Trafficking). Of these 4,829 cases, 4,626 had complete guideline application information. There were an additional 26 cases excluded with base offense levels not displayed in this table. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: This was produced using the U.S. Sentencing Commission's Interactive Sourcebook (isb.ussc.gov) using the Commission's fiscal year 2013 Datafile, USSCFY2013.

# BASE OFFENSE LEVELS IN EACH DRUG TYPE FOR DRUG TRAFFICKING CASES[1]
## Fiscal Years: 2009-2013
### District: California North

| Base Offense Level | Total | Powder Cocaine | | Crack Cocaine | | Heroin | | Marijuana | | Metham- phetamine | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| Total | 884 | 82 | 9.3 | 161 | 18.2 | 54 | 6.1 | 72 | 8.1 | 430 | 48.6 | 85 | 9.6 |
| 12 | 8 | 0 | 0.0 | 2 | 1.2 | 1 | 1.9 | 3 | 4.2 | 1 | 0.2 | 1 | 1.2 |
| 14 | 13 | 3 | 3.7 | 0 | 0.0 | 0 | 0.0 | 3 | 4.2 | 1 | 0.2 | 6 | 7.1 |
| 16 | 11 | 2 | 2.4 | 1 | 0.6 | 1 | 1.9 | 4 | 5.6 | 2 | 0.5 | 1 | 1.2 |
| 18 | 20 | 5 | 6.1 | 6 | 3.7 | 0 | 0.0 | 6 | 8.3 | 1 | 0.2 | 2 | 2.4 |
| 20 | 29 | 2 | 2.4 | 3 | 1.9 | 0 | 0.0 | 15 | 20.8 | 2 | 0.5 | 7 | 8.2 |
| 22 | 20 | 2 | 2.4 | 5 | 3.1 | 4 | 7.4 | 4 | 5.6 | 2 | 0.5 | 3 | 3.5 |
| 24 | 64 | 0 | 0.0 | 52 | 32.3 | 2 | 3.7 | 7 | 9.7 | 1 | 0.2 | 2 | 2.4 |
| 26 | 190 | 24 | 29.3 | 35 | 21.7 | 15 | 27.8 | 18 | 25.0 | 73 | 17.0 | 25 | 29.4 |
| 28 | 78 | 8 | 9.8 | 13 | 8.1 | 9 | 16.7 | 4 | 5.6 | 37 | 8.6 | 7 | 8.2 |
| 30 | 80 | 8 | 9.8 | 21 | 13.0 | 4 | 7.4 | 3 | 4.2 | 35 | 8.1 | 9 | 10.6 |
| 31 | 16 | 0 | 0.0 | 0 | 0.0 | 1 | 1.9 | 0 | 0.0 | 13 | 3.0 | 2 | 2.4 |
| 32 | 136 | 17 | 20.7 | 19 | 11.8 | 8 | 14.8 | 4 | 5.6 | 79 | 18.4 | 9 | 10.6 |
| 33 | 10 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 9 | 2.1 | 1 | 1.2 |
| 34 | 114 | 9 | 11.0 | 3 | 1.9 | 7 | 13.0 | 1 | 1.4 | 91 | 21.2 | 3 | 3.5 |
| 36 | 40 | 2 | 2.4 | 1 | 0.6 | 2 | 3.7 | 0 | 0.0 | 33 | 7.7 | 2 | 2.4 |
| 38 | 55 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 | 50 | 11.6 | 5 | 5.9 |

[1] Of the 4,063 cases, 926 were sentenced under §2D1.1 (Drug Trafficking). Of these 926 cases, 895 had complete guideline application information. There were an additional 11 cases excluded with base offense levels not displayed in this table. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: This was produced using the U.S. Sentencing Commission's Interactive Sourcebook (isb.ussc.gov) using the Commission's fiscal year 2009-2013 Datafiles, USSCFY2009-USSCFY2013.

# BASE OFFENSE LEVELS IN EACH DRUG TYPE FOR DRUG TRAFFICKING CASES[1]
## Fiscal Year: 2013

| Base Offense Level | Total | Powder Cocaine | | Crack Cocaine | | Heroin | | Marijuana | | Metham- phetamine | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| **Total** | **21,199** | **4,961** | **23.4** | **2,753** | **13.0** | **2,113** | **10.0** | **4,540** | **21.4** | **5,273** | **24.9** | **1,559** | **7.4** |
| 12 | 452 | 138 | 2.8 | 65 | 2.4 | 70 | 3.3 | 72 | 1.6 | 43 | 0.8 | 64 | 4.1 |
| 14 | 325 | 79 | 1.6 | 49 | 1.8 | 49 | 2.3 | 97 | 2.1 | 25 | 0.5 | 26 | 1.7 |
| 16 | 679 | 116 | 2.3 | 93 | 3.4 | 58 | 2.7 | 315 | 6.9 | 36 | 0.7 | 61 | 3.9 |
| 18 | 1,303 | 171 | 3.4 | 140 | 5.1 | 70 | 3.3 | 748 | 16.5 | 64 | 1.2 | 110 | 7.1 |
| 20 | 977 | 158 | 3.2 | 110 | 4.0 | 50 | 2.4 | 502 | 11.1 | 49 | 0.9 | 108 | 6.9 |
| 22 | 589 | 82 | 1.7 | 89 | 3.2 | 55 | 2.6 | 265 | 5.8 | 35 | 0.7 | 63 | 4.0 |
| 24 | 770 | 109 | 2.2 | 129 | 4.7 | 76 | 3.6 | 332 | 7.3 | 54 | 1.0 | 70 | 4.5 |
| 26 | 4,541 | 941 | 19.0 | 881 | 32.0 | 474 | 22.4 | 1,234 | 27.2 | 609 | 11.5 | 402 | 25.8 |
| 28 | 1,690 | 364 | 7.3 | 299 | 10.9 | 217 | 10.3 | 318 | 7.0 | 326 | 6.2 | 166 | 10.6 |
| 30 | 1,676 | 485 | 9.8 | 156 | 5.7 | 281 | 13.3 | 259 | 5.7 | 387 | 7.3 | 108 | 6.9 |
| 31 | 447 | 136 | 2.7 | 5 | 0.2 | 63 | 3.0 | 10 | 0.2 | 220 | 4.2 | 13 | 0.8 |
| 32 | 3,011 | 951 | 19.2 | 396 | 14.4 | 346 | 16.4 | 251 | 5.5 | 875 | 16.6 | 192 | 12.3 |
| 33 | 316 | 30 | 0.6 | 4 | 0.1 | 25 | 1.2 | 1 | 0.0 | 248 | 4.7 | 8 | 0.5 |
| 34 | 2,295 | 594 | 12.0 | 168 | 6.1 | 168 | 8.0 | 98 | 2.2 | 1,169 | 22.2 | 98 | 6.3 |
| 36 | 952 | 239 | 4.8 | 94 | 3.4 | 67 | 3.2 | 26 | 0.6 | 488 | 9.3 | 38 | 2.4 |
| 38 | 1,176 | 368 | 7.4 | 75 | 2.7 | 44 | 2.1 | 12 | 0.3 | 645 | 12.2 | 32 | 2.1 |

[1] Of the 80,035 cases, 21,952 were sentenced under §2D1.1 (Drug Trafficking). Of these 21,952 cases, 21,481 had complete guideline application information. There were an additional 282 cases excluded with base offense levels not displayed in this table. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: This was produced using the U.S. Sentencing Commission's Interactive Sourcebook (isb.ussc.gov) using the Commission's fiscal year 2013 Datafile, USSCFY2013.

# Attachment F

**MANUALLY FILED**

Video produced in discovery in *United States v. Acacia McNeal.* No. 15-028 CRB

# Attachment G

**MANUALLY FILED**

Video produced in discovery in *United States v. Cassie Roberts,* No. 13-CR-760 CRB.

# Attachment H

**FILED UNDER SEAL**

Attachment I

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  JOHN H. HEMANN (CABN 165823)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
7       FAX: (415) 436-7234
        John.Hemann@usdoj.gov
8
   Attorneys for United States of America
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,          )  Case No. CR 14-0102 CRB
                                       )
15         Plaintiff,                  )  DECLARATION OF SPECIAL AGENT TYLER
                                       )  NAVE IN SUPPORT OF GOVERNMENT'S
16      v.                             )  OPPOSITION TO DEFENDANT FURMINGER'S
                                       )  MOTION FOR BAIL PENDING APPEAL
17  IAN FURMINGER,                     )
                                       )
18         Defendant.                  )
    _____)

19

20     I, Tyler Nave, declare as follows:

21  1. I am a Special Agent with the Federal Bureau of Investigations (FBI).  I have been a special

22     agent since March 2009.  I am one of the agents assigned to this case.

23  2. During the investigation that led to this case, the FBI obtained text messages for Ian Furminger's

24     personal mobile telephone number, including for the time from October 2011 to June 2012.

25     Furminger was still a San Francisco Police Officer during this time frame.  Text messages for

26     earlier times were not available when the FBI obtained these messages.

27  3. I have reviewed the text messages seized by the FBI.  The messages include overtly racists and

28     homophobic statements made by Furminger and people with whom he was communicating.

1    4. I prepared the attached spreadsheet, Attachment A, containing some of those messages.

2        a.  The text of the messages highlighted in yellow were messages sent from Furminger's cell

3            phone.

4        b.  I redacted the telephone numbers from the spreadsheet.

5            i.  The redactions in red, which appear as red blocks, are from Furminger's cell

6                phone.

7            ii. The redactions in blue are from telephone numbers I know from my investigation

8                to be associated with other San Francisco Police Officers.

9            iii. The redactions in black are from telephone numbers associated with civilians

10               known to the FBI or with individuals not known to the FBI.

11   I swear under penalty of perjury that the foregoing statements are true and correct to the best of

12   my knowledge.  Executed this 13th day of March 2015 at San Francisco, California.

13

14                                         TYLER NAVE
                                           Special Agent, FBI
15

16

17

18

19

20

21

22

23

24

25

26

27

28

| MESSAGE DATE/TIME | FROM | TO | MESSAGE TEXT |
|---|---|---|---|
| 10/25/2011 16:13:36 | | | [ Dont worry about my height, worry that Im white! ] |
| 10/25/2011 16:14:08 | | | [ White Power! ] |
| | | | |
| 10/26/2011 18:57:21 | | | [ I was trying to be nice to you as everyone knows your gay ] |
| 10/27/2011 17:20:30 | | | [ I love calling you a fag! Good enough? ] |
| | | | |
| 10/31/2011 9:38:20 | | | [ Looks like the minutes ran out on your mexican phone again bitch! ] |
| | | | |
| 11/09/2011 10:07:13 | | | [ I'm working on us ] |
| 11/09/2011 10:13:24 | | | [ Fuckin border bandits ] |
| 11/09/2011 10:15:54 | | | [ We got two blacks at my boys school and they are brother and sister! There cause dad works for school district and I am watching them like hawks ] |
| 11/09/2011 10:17:46 | | | [ Do you celebrate qaunza at your school? ] |
| 11/09/2011 10:19:18 | | | [ Yeah we burn the cross on the field! Then we celebrate Whitemas ] |
| 11/09/2011 10:20:33 | | | [ Its worth every penny to live here away from the savages ] |
| | | | |
| 11/21/2011 17:00:35 | | | [ Those guys are pretty stupid! Ask some dumb ass questions you would expect from a black rookie! Sorry if they are your buddies! ] |
| | | | |
| 11/24/2011 7:58:49 | | | [ The buffalo soldier was why the indians Wouldnt shoot the niggers that fought for the confederate They thought they were sacred buffalo and not human ] |
| 11/24/2011 7:58:50 | | | [ They were not far off Marley was a nigger ] |

| | | | |
|---|---|---|---|
| 11/24/2011 8:01:11 | | | [ Ha! We stole california from the mexicans too! Would have had Baha too but felt it wasnt worth it ] |
| 11/24/2011 8:03:41 | | | [ n The indians never had shit Columbus thought he landed where he was headed India So HE named them indians They never had a name of their own And the ] |
| 11/24/2011 8:03:42 | | | [ n re is evidence that the moors niggers were here first ] |
| 11/24/2011 8:06:41 | | | [ Gunther Furminger was a famous slave auctioneer ] |
| 12/08/2011 7:21:41 | | | [ I cant imagine working At costco and hanging out with filthy flips. hate to sound racist but that group is disgusting ] |
| 12/10/2011 7:50:55 | | | [ 5 He would be so much better off had he married a white chick with a brain he would have a nice house with white kids that were not ghetto as his are An ] |
| 12/10/2011 8:06:09 | | | [ Just saw on news there was a peace march in oakland. everyone marching was whilte ] |
| 12/10/2011 15:34:36 | | | [ My wife has 2 friends over that dont know each other the cool one says to me get me a drink nigger not knowing the other is married to one just happ ] |
| 12/10/2011 15:34:36 | | | [ ened right now LMFAO ] |
| 12/10/2011 16:15:04 | | | [ Can you work tomorrow? ] |
| 12/10/2011 16:32:54 | | | [ I hardly remember being at your crib! straight swervin nitro! bout to do it again foo ] |

| Date/Time | | | Message |
|---|---|---|---|
| 12/10/2011 16:34:23 | | | [ Cool...hopefully I'll be 97 ] |
| 12/10/2011 16:35:04 | | | [ Da naaaa ] |
| 12/10/2011 16:48:54 | | | [ Gotta get my drunk on....! ] |
| 12/10/2011 16:49:42 | | | [ Word! let me know blood ] |
| | | | |
| 12/10/2011 17:21:16 | | | Have fun tonight! but dont stand under the miselto ] |
| 12/10/2011 17:24:25 | | | [ Hoda and i are getting married! ] |
| 12/10/2011 18:01:32 | | | [ [name redacted] walked up to [name redacted] and said Break yo-self nigga! Then [name redacted] said, dont make me go old school on yo bitch ass nigga! ] |
| | | | |
| 1/23/2012 18:00:29 | | | Ok is fine in the morning im going. In the morning for orden my medical report to hospital |
| 1/23/2012 18:10:51 | | | Ok |
| 1/23/2012 18:11:59 | | | Yeah man something else man! Fuckin sorry ass people |
| 1/23/2012 18:13:19 | | | Ok see you in susie house 3:00pm tank you |
| 1/23/2012 18:13:59 | | | And only when they think there caught red handed...there us a reason why people for not like ....friend....lol |
| 1/23/2012 18:34:00 | | | Oh my fucking god, r u kidding me? i am so sorry |
| 1/23/2012 18:40:06 | | | No not at all, are You kidding me? Its all good, I expected a lot of work and thats not much |
| 1/23/2012 18:41:15 | | | They are called black |
| 1/25/2012 11:15:08 | | | White power |
| | | | |
| 1/28/2012 12:39:45 | | | White Power Family, [Furminger home address redacted] |

| | | | |
|---|---|---|---|
| 2/5/2012 13:45:39 | | | All good, I still hate black people! |
| | | | |
| 2/10/2012 9:43:26 | | | Niggers should be spayed |
| 2/10/2012 9:44:35 | | | I saw one an hour ago with 4 kids |
| 2/10/2012 9:44:59 | | | See |
| 2/10/2012 9:45:18 | | | That would be four less |
| | | | |
| 2/21/2012 19:19:36 | | | I am just leaving it like it is, painting KKK on the sides and calling it a day! |
| 2/22/2012 13:04:25 | | | Cross burning lowers blood pressure! I did the test myself! |
| 2/22/2012 13:05:39 | | | So do I. Every camping trip I burn an image of the prez |
| 2/24/2012 15:36:29 | | | At his school! Multi purpose room! Their shouldnt be any blacks! |
| | | | |
| 2/28/2012 9:22:05 | | | All niggers must fucking hang |
| 2/28/2012 9:22:09 | | | Oh and Peachey is fuckin retarded |
| 2/28/2012 9:23:22 | | | Ask my 6 year old what he thinks about Obama |
| | | | |
| 4/16/2012 12:05 | | | [ Just boarded train at Mission/16th ] |
| 4/16/2012 12:06 | | | [ Ok, watch out for BM's ] |
| 4/16/2012 12:07 | | | [ Too late. I'm surrounded. And the only gun I have is broken! ] |
| 4/16/2012 12:08 | | | [ Your fucked ] |
| 4/16/2012 12:08 | | | [ Dumb nig nugs. ] |
| | | | |
| 4/18/2012 19:20 | | | [ 20,000 bees are in Vacaville near School but they are not dangerous like black people ] |
| | | | |
| 4/20/2012 15:28 | | | [ You are a total homo! And your gay! ] |

| Date/Time | | | Message |
|---|---|---|---|
| 5/5/2012 17:41:59 | | | [ Busted up but thats what happens to fags! ] |
| | | | |
| 5/6/2012 10:54:36 | | | [ We decided to chill but ended up going to BC house for first half of fight! Home around 9 ish ] |
| 5/6/2012 10:55:29 | | | [ Cool...who won that....cotto...not ] |
| 5/6/2012 10:56:23 | | | [ No, the nigger! ] |
| 5/6/2012 10:56:48 | | | [ Nigger... ] |
| | | | |
| 5/10/2012 14:39:25 | | | [ I resent you an email because I haven't heard from you. When do you plan to pay me child support for this month? ] |
| 5/10/2012 14:40:22 | | | [ When do You plan on letting me see [name redacted]? ] |
| 5/10/2012 14:51:26 | | | [ As soon as she wants to but it would be a mistake to force her at this point. ] |
| 5/10/2012 14:51:50 | | | [ Does that mean that you don't plan on paying me? ] |
| 5/10/2012 17:02:17 | | | [ Please answer me. \nDo you plan on paying child support?\n ] |
| 5/10/2012 17:03:55 | | | [ Please answer me! Court wants joint custody, you want full custody! You have a plan to keep me out of [name redacted]life for good ] |
| 5/10/2012 17:05:40 | | | [ Court wants joint custody? What are you talking about? Will you be paying child support? ] |
| 5/10/2012 17:06:46 | | | [ Read last text ] |
| 5/10/2012 17:08:31 | | | [ I'm tired of your nonsense. I need to know if you are planning to pay child support so I can make the necessary decisions. ] |
| 5/10/2012 17:09:32 | | | [ Are You planning on letting me see [name redacted]! I am tired of You hurting her future! ] |

| | | |
|---|---|---|
| 5/10/2012 17:11:57 | | [ I'm tired of your nonsense. I need to know if you are planning to pay child support so I can make the necessary decisions. ] |
| 5/10/2012 17:12:27 | | [ Are You planning on letting me see [name redacted]! I am tired of You hurting her future! ] |
| 5/10/2012 17:26:11 | | [ [name redacted] doesn't want to see you. You have hurt her, repeatedly. ] |
| 5/10/2012 17:28:02 | | [ No, You have hurt her permanently! This was never about her and I, and now she lost her Dad and brother over your inability to budget money! ] |
| 5/10/2012 17:28:54 | | [ You should see this text war I am having with Lucie! Awesome! Fuck her! ] |
| 5/10/2012 17:31:17 | | [ Ian you are once again...confused, making things worse and causing stress. Please reply about child support. ] |
| 5/10/2012 17:33:18 | | [ And You broke my parents hearts too They are 81 and not in great health Her dog is not doing great either Hope your happy cause the gravy train runs ] |
| 5/10/2012 17:33:19 | | [ to a complete stop in 5 years My parents and Kojack will be gone by then and [name redacted] will be in high school ] |
| 5/10/2012 17:36:14 | | [ I am far from confused! You have an agenda and is going to seriously damage [name redacted] and her future! ] |
| 5/10/2012 17:42:38 | | [ Does that mean that you will pay child support? ] |
| 5/10/2012 18:11:53 | | [ Since this all started you have done nothing to reunite [name redacted] and I only asked for money You all talk about me hurting [name redacted] but never the reason so we ] |
| 5/10/2012 18:11:54 | | [ can come to a resolution ] |

| | | | |
|---|---|---|---|
| 5/10/2012 18:14:06 | | | [ You keep creating more reasons. It's been hard to keep up. We 'all' have told you repeatedly. I only ask for [name redacted] child support when you fail to pay me. ] |
| | | | |
| 5/19/2012 19:45:04 | | | [ I hate to tell you this but my wife friend is over with their kids and her husband is black! If is an Attorney but should I be worried? ] |
| 5/19/2012 20:27:04 | | | [ Get ur pocket gun. Keep it available in case the monkey returns to his roots. Its not against the law to put an animal down ] |
| 5/19/2012 20:27:41 | | | [ Well said! ] |
| 5/19/2012 20:29:32 | | | [ U may have to kill the half breed kids too. Don't worry. Their an abomination of nature anyway. ] |
| | | | |
| 6/2/2012 20:38:33 | | | [ Dude. Your boy made Q50 . Sgt. Aj Holder ] |
| 6/2/2012 20:39:00 | | | [ Fuckin nigger ] |
| 6/2/2012 20:39:46 | | | [ LoL and Yolanda Williams ] |
| 6/2/2012 20:40:07 | | | [ Or my ] |
| 6/2/2012 20:40:02 | | | [ Nigger bitch ] |
| | | | |
| 6/10/2012 22:50:24 | | | [ Your sister lies more than any nigger I have ever met in my life! You awake? ] |

| Key | |
|---|---|
| | Ian Furminger's redacted telephone number |
| | Police Officer's redacted telephone numbers |
| | Non-Police Officer's redacted telephone numbers |
| | Ian Furimnger's sent text messages |

Attachment J

News    Search:    Guidelines Manual    Interactive Sourcebook    Research and Publications    Training

Amendment Process

Home » Report on Cocaine and Federal Sentencing Policy

# Report on Cocaine and Federal Sentencing Policy

## Chapter 6

### The National Legislative and Law Enforcement Response to Cocaine

**A. INTRODUCTION**

For at least a century, federal, state, and local governments have responded to drug use. The responses have been shaped by numerous factors, including constitutional and other divisions of governmental responsibility, the extent and nature of the immediate drug use problem, and public concern over the problem. This chapter examines the national legislative and law enforcement response to cocaine, including both federal and state responses.

To give some context, Section B first traces the history of national legislative and law enforcement efforts surrounding cocaine and other drugs. Section C lays out the congressional response to the evolving cocaine problem over the last two decades or so. This section includes a discussion of the reemergence of determinate sentencing in the federal system through the Sentencing Reform Act of 1984, mandatory minimum prison sentences and the Anti-Drug Abuse Acts of 1986 and 1988, and the distinctions made in federal legislation between crack cocaine and powder cocaine. Section D sets forth how the United States Sentencing Commission established sentencing guidelines for cocaine offenses in light of congressional action. Section E addresses the role of federal law enforcement agencies today in the national drug control strategy. Section F lays out the legislative responses of the states to cocaine. Finally, Section G considers the impact of prosecutorial and investigative discretion on cocaine offenders and sentences in the face of federal and state laws.

**B. THE HISTORY OF LEGISLATIVE AND LAW ENFORCEMENT EFFORTS**

**1. An Earlier Cocaine Era**

As discussed earlier in this report (*see* Chapter 2), the surge in cocaine use in the 1970s and 1980s was not without precedent. In the mid-1880s, cocaine was introduced into the United States and was used widely through the early 1900s. Cocaine was promoted as a remedy for respiratory ailments, as an aphrodisiac, and as an antidote for morphine addiction and alcoholism. J. Murray, "An Overview of Cocaine Use and Abuse," 59 Psychological Reports 243-264 (1986).

By the turn of the century, the dangers of cocaine use and addiction were becoming apparent. As noted earlier, in 1891 for example, 200 deaths from cocaine intoxication were reported. D. Allen and J. Jekel, Crack: The Broken Promise (1991). And according to one estimate, the U.S. population in 1906 - numbering only half of today's population - consumed as much cocaine as did the U.S. population in 1976. *Id*.

As early as 1887, some states began regulating cocaine. By 1914, the year the Harrison Narcotics Act was passed on the national level, 46 states had laws regulating the use and distribution of cocaine. Leading up to the Harrison Act, in 1910 the President presented Congress with a report that found cocaine to be more dangerous than any other "habit-forming" drug used in the United States. The Harrison Act was then passed, banning non-medical use of cocaine and requiring strict accounting of medical dispensing to patients. D. Musto, "Opium, Cocaine and Marijuana in American

History," Scientific American 44 (1991).

The Harrison Act was enforced by agents in the Treasury Department's Prohibition Unit of the Narcotics Division. Initial law enforcement efforts included arrests of physicians, pharmacists, and unregistered users. The Narcotics Division also aimed at closing clinics that had sprung up to treat addicts and that used maintenance regimens as part of the treatment.

Following passage of the Harrison Act, cocaine became scarce. By the 1950s, use of cocaine had declined, and the drug was no longer considered a problem. Murray, *supra* note 1; R. Siegel, "New Patterns of Cocaine Use: Changing Doses and Routes," 61 National Institute on Drug Abuse Research Monograph Series 204-222 (1985). Cocaine reemerged as a drug of abuse during the mid-1960s. *Id.*

## 2. Other Drug Enforcement Efforts

Following the Civil War and through the rest of the 19th Century, opium was used extensively in pockets of the United States. In response to this, the first recorded drug law in the United States was passed: a municipal ordinance in San Francisco banning opium dens. A series of state laws followed. In 1887, the federal government prohibited the importation of opium by Chinese nationals, and, in 1905, restricted opium smoking in the Philippines. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Drugs, Crime and the Justice System, 78-80 (Dec. 1992).

In the following years, the United States launched a series of international conventions designed to foster narcotics control activity, including the Shanghai Opium Convention of 1909 and the 1911 International Conference on Opium at The Hague. These conferences ultimately led to the 1914 Harrison Act, regulating cocaine and other drugs. Musto, *supra* note 4.

As the availability of cocaine diminished following the Harrison Act, a concurrent rise occurred in the popularity of marijuana, amphetamines, and other drugs with similar physiological and psychotropic effects. In 1922, the Narcotic Drugs Import and Export Act restricted drug imports and created the Federal Narcotics Control Board composed of the Secretaries of State, Treasury, and Commerce. The Act expanded the role of the Customs Department in interdicting illegal narcotics shipments to the United States. U.S. Department of Justice, *supra* note 7.

In 1930, the Federal Bureau of Narcotics was created and charged with enforcing drug laws, excluding alcohol laws. In the next several years, growing public concern about marijuana prompted passage of many state laws prohibiting its use. This led to the Marijuana Tax Act of 1937, which regulated and taxed marijuana at the federal level. Musto, *supra* note 4.

Following World War II, drugs again became a national concern. The Boggs Act of 1951 and the Narcotic Control Act of 1956 increased maximum criminal penalties for violations of the import/export and internal revenue laws related to drugs and also established mandatory minimum prison sentences. These penalties were later increased and broadened. U.S. Department of Justice, *supra* note 7.

In 1961, the United Nations adopted the Single Convention on Narcotic Drugs, establishing regulatory schedules for psychotropic substances. In the United States in 1963, the Prettyman Commission recommended the imposition of strict federal control for certain drugs and the transfer of federal law enforcement responsibilities to the Department of Justice. In the 1960s, as a shifting pattern of drug use emerged, federal legislation continued. The 1965 Drug Abuse Control Amendments began regulating the manufacture and distribution of amphetamines and barbiturates and included new criminal penalties. In 1966 and 1968, legislation provided for new treatment programs, and, in 1968, the Federal Bureau of Narcotics was transferred to the Department of Justice. *Id.*

## C. THE CONGRESSIONAL RESPONSE TO COCAINE SINCE 1970

### 1. The 1970s and the Repeal of Mandatory Minimum Penalties

In 1970, Congress overhauled the federal drug control laws. Included in this overhaul was a general repeal of the mandatory minimum sentences for drug offenses. The mandatory penalty provisions of the Continuing Criminal

Enterprise offenses remained intact. The authors of the Comprehensive Drug Abuse Prevention and Control Act of 1970 expressed a general concern that "increasingly longer sentences that had been legislated in the past had not shown the expected overall reduction in drug law violations." S. Rep. No. 613, 91st Cong., 1st Sess. (Dec. 16, 1969). Moreover, there was general concern that "severe drug laws, specifically as applied to marihuana, have helped create a serious clash between segments of the youth generation and the Government" and have "contributed to the broader problem of alienation of youth from the general society." *Id*. As a result, the 1970 Act revised the penalty structure of federal drug law. "The main thrust of the change in the penalty provisions [was] to eliminate all mandatory minimum sentences for drug law violations except for a special class of professional criminals."*Id*.

The legislative history of the 1970 Act shows that Congress was concerned that mandatory minimum penalties hampered the "process of rehabilitation of offenders" and infringed "on the judicial function by not allowing the judge to use his discretion in individual cases." *Id*. Some members of Congress also argued that the mandatory minimum penalties reduced the deterrent effect of the law by reducing the consistency with which the drug laws were applied:

The severity of existing penalties, involving in many instances minimum mandatory sentences, have led in many instances to reluctance on the part of prosecutors to prosecute some violations, where the penalties seem to be out of line with the seriousness of the offense. In addition, severe penalties, which do not take into account individual circumstances, and which treat casual violators as severely as they treat hardened criminals, tend to make convictions somewhat more difficult to obtain. H. Rep. No. 1444, 91st Cong., 2d Sess., at 11 (Sept. 10, 1970).

In addition, the 1970 Act created a common standard for scheduling drugs. The Racketeer-Influenced and Corrupt Organizations and Continuing Criminal Enterprise laws, also passed in 1970, focused on the leaders of illegal drug enterprises and added forfeiture as an enforcement tool. In 1971, a Presidential Cabinet Committee for International Narcotic Control, chaired by the Secretary of State, was formed. The Foreign Assistance Act, passed in 1971, authorized assistance to countries to control drug trafficking and production. The Drug Abuse Office and Treatment Act of 1972 created the National Institute on Drug Abuse and the Special Action Office for Drug Abuse Prevention. In 1973, the Drug Enforcement Administration was created.

**2. The 1980s and the Reemergence of Determinate Sentencing For further historical background on this topic,** *see* **U.S. Sentencing Commission, <u>The Federal Sentencing Guidelines: A Report on the Operation of the Guidelines System and Short-Term Impacts on Disparity in Sentencing, Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining</u> 7-14, 24-28 (Dec. 1991); U.S. Sentencing Commission, <u>Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System</u> 5-10 (Aug. 1991).**

In the 1980s, Congress made "determinate sentencing," which had been gaining acceptance in the states, the center of federal sentencing policy. Congress questioned the legitimacy of indeterminate sentences and early parole release, particularly the ability of prison to rehabilitate offenders and of parole boards to identify offenders ready for release. At the same time an emerging consensus concluded that criminal laws would better help control crime if sentences were more certain, less disparate, and sufficiently punitive.

Through different laws, Congress enacted determinate sentencing in several forms in the 1980s. First, Congress passed the Sentencing Reform Act of 1984. Pub. L. No. 98-473, 98 Stat. 1837 (1984) This law established the United States Sentencing Commission ("Commission") and directed it to promulgate a system of detailed, mandatory sentencing guidelines to assure more uniform federal court sentencing decisions. In addition, the Act abolished parole for defendants sentenced under the sentencing guidelines.

At the same time, and repeatedly since, Congress enacted mandatory minimum penalties for certain drug and firearms offenses. Mandatory minimums were enacted in 1984, 1986, 1988, and to a lesser extent in 1994, and legislative proposals currently under consideration continue to include mandatory minimum penalty provisions. *See, e.g.*, S. 3 (Violent Crime Control and Law Enforcement Improvement Act of 1995), S. 38 (Violent Crime Control and Law Enforcement Amendments Act of 1995), and H.R. 3 (Taking Back Our Streets Act of 1995). These statutes represent an approach very different than that embodied by guideline sentencing. *See, e.g.*, the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, 98 Stat. 2019 (1984). Both the mandatory minimums and the guidelines are mandatory determinate sentencing schemes. The statutes, however, set a minimum penalty based on only a few characteristics of the offense and offender, particularly the type and amount of drug involved in the offense. Judges can sentence below

this level only when the government makes a motion that the defendant has substantially assisted in the prosecutions of other persons. The guidelines take into account many more aggravating and mitigating factors. Judges can sentence outside the guideline range if there is a unusual factor present in the case that is not taken into consideration by the guidelines.

**3. The Anti-Drug Abuse Act of 1986**

The Anti-Drug Abuse Act of 1986 Pub. L. No. 99-570, 100 Stat. 3207 (1986). created the basic framework of mandatory minimum penalties that currently apply to federal drug trafficking offenses. The 1986 Act established two tiers of mandatory prison terms for first-time drug traffickers: a five-year and a ten-year minimum sentence. Under the statute, these prison terms are triggered exclusively by the quantity and type of drug involved in the offense. For example, the ten-year penalty is triggered if the offense involved at least one kilogram of heroin or five kilograms of powder cocaine or 50 grams of cocaine base. Under the Act's approach, higher mandatory minimum penalties can apply if the offender previously had been convicted of a drug trafficking offense. *See, e.g.*, 21 U.S.C. 841(b)(1)(A).

The 1986 Act initiated the federal criminal law distinction between "cocaine base" and other forms of cocaine. The thresholds triggering the ten-year penalty - five kilograms of powder cocaine and 50 grams of cocaine base - create the 100-to-1 quantity ratio discussed at various points in this report. The identical ratio is reflected in the five-year mandatory minimum thresholds as well: 500 grams of powder cocaine and five grams of cocaine base both trigger the five-year penalty.

**a. The General Legislative History of the 1986 Act; Development of the 100-to-1 Quantity Ratio**

The 1986 Act was expedited through Congress. As a result, its passage left behind a limited legislative record. While many individual members delivered floor statements about the Act, no committee produced a report analyzing the Act's key provisions. One committee report was issued on a legislative initiative that mirrored the penalty provisions of the 1986 Act in some ways. *See* H.R. Rep. No. 845, 99th Cong., 2d Sess., pt. 1 (1986). That report contains some general guidance on the thinking behind penalty levels and is discussed below. The sentencing provisions of the Act were initiated in August 1986, following the July 4th congressional recess during which public concern and media coverage of cocaine peaked as a result of the June 1986 death of NCAA basketball star Len Bias. Apparently because of the heightened concern, Congress dispensed with much of the typical deliberative legislative process, including committee hearings.

Of particular relevance to this report, the legislative history does not include any discussion of the 100-to-1 powder cocaine/crack cocaine quantity ratio *per se*. Congress did, however, consider a variety of powder/crack quantity ratios before adopting 100-to-1. For example, the original version of the House bill that ultimately was enacted into law (H.R. 5484) H.R. 5484, as amended by S. 2878 (the Anti-Drug Abuse Act of 1986), was passed by Congress and signed into law on October 27, 1986. The Senate bill (S. 2878) contained the 100-to-1 powder cocaine/crack cocaine quantity ratio. contained a quantity ratio of 50-to-1; *See also* H.R. 5394 (Narcotics Penalties and Enforcement Act of 1986) (containing 50-to-1 ratio). a number of other bills introduced during this period contained ratios of 20-to-1. *See, e.g.*, S. 2787 (Mandatory Crack and Other Drug Penalties Act); S. 2849 (Drug Free Federal Workplace Act of 1986) (The Zero-Tolerance Act); S. 2850 (Drug Enforcement Act of 1986) (The Zero-Tolerance Act). One of the bills containing a 20-to-1 ratio (S. 2849) was introduced on behalf of the Reagan Administration by Senate Majority Leader Dole.

The legislative history, as evidenced mainly by the statements of individual legislators, suggests four specific areas of congressional purpose.

To the extent that Congress saw the drug problem as a national "epidemic" in 1986, it viewed crack cocaine as at the very forefront.

The decision by Congress to differentiate crack cocaine from powder cocaine in the penalty structure was deliberate, not inadvertent.

The legislative history, primarily in the form of member floor statements, shows (1) that Congress had concluded that crack cocaine was more dangerous than powder cocaine and (2) that this conclusion drove its decision to treat crack cocaine differently from powder cocaine.

While Congress determined that the greater dangerousness of crack cocaine warranted "special" heightened penalties, Congress also generally intended that the quantities triggering drug mandatory minimum penalties for crack cocaine would be consistent with the 1986 Act's overall drug mandatory minimum scheme: quantities thought to be associated with "major" traffickers were to subject a defendant to a ten-year penalty and quantities thought to be associated with "serious" traffickers were to subject a defendant to a five-year penalty.

Congress's conclusions about the dangerousness of crack cocaine relative to powder cocaine flowed from specific assumptions. First, crack cocaine was viewed as extraordinarily addictive. This addictive nature was stressed not only in comparison to powder cocaine (*i.e.*, crack cocaine is "the more addictive . . . substance" 132 Cong. Rec. S8092 (June 6, 1986) (statement of Sen. D'Amato regarding S. 2580). *See also* 132 Cong. Rec. S14,293 (Sept. 30, 1986) (statement of Sen. Bumpers.) but also in absolute terms. Second, the correlation between crack cocaine use and the commission of other serious crimes was considered greater than that with other drugs. Floor statements focused on psychopharmacologically driven, economically compulsive, as well as systemic crime (although members did not typically use these terms). Third, the physiological effects of crack cocaine were considered especially perilous, leading to psychosis and death. 132 Cong. Rec. 26,447 (Sept. 26, 1986) (statement of Sen. Chiles). Fourth, members of Congress felt that young people were particularly prone to using crack cocaine. This was mentioned in debate as one of crack cocaine's most troubling features. Finally, there was a great concern that crack's "purity and potency," the cost per dose, the ease with which it is manufactured, transported, disposed of, and administered, were all leading to widespread use of crack.

Significantly, all federal circuit courts addressing the constitutionality of crack cocaine penalties have upheld the current federal cocaine sentencing scheme, including the 100-to-1 ratio. The courts have held that Congress had a "rational basis" for the penalty distinction, and that the penalty distinction was created out of the legitimate congressional objective of protecting the public against a new and highly potent, addictive narcotic that could be distributed easily and sold cheaply. (*See* Appendix C for a complete discussion of the legal challenges to crack cocaine penalties.)

**b. Legislative History Surrounding Mandatory Minimum Penalties**

In tying mandatory minimum penalties to the quantity of drug involved in trafficking offenses, Congress apparently intended that these penalties most typically would apply to discrete categories of traffickers - specifically, "major" traffickers (ten-year minimum) and "serious" traffickers (five-year minimum). In other words, Congress had in mind a tough penalty scheme under which, to an extent, drug quantity would serve as a proxy to identify those traffickers of greatest concern. Senator Byrd, then the Senate Minority Leader, summed up the intent during floor debate:

For the kingpins - the masterminds who are really running these operations - and they can be identified by the amount of drugs with which they are involved - we require a jail term upon conviction. If it is their first conviction, the minimum term is 10 years . . . Our proposal would also provide mandatory minimum penalties for the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail - a minimum of 5 years for the first offense. 132 Cong. Rec. S. 14,300 (Sept. 30, 1986). *See also* 132 Cong. Rec. 22,993 (Oct. 11, 1986) (statement of Rep. LaFalce) ("the bill... acknowledge[s] that there are differing degrees of culpability in the drug world. Thus, separate penalties are established for the biggest traffickers, with another set of penalties for other serious drug pushers"); H.R. Rep. No. 9-845, 99th Cong., 2d Sess., pt. 1 at 11-17 (1986) (construing penalty provisions of a comparable bill (H.R. 5394) similarly).

Portions of the limited legislative history suggest that Congress intended, for all drug categories including crack cocaine, to link the ten-year mandatory minimum trafficking prison term to major drug dealers and to link the five-year minimum term to serious traffickers.

Perhaps of greatest import to cocaine offense sentencing, is the report issued by the House Judiciary Subcommittee on Crime following its consideration of an earlier version of the bill (H.R. 5394). The crack cocaine triggering amounts in H.R. 5394 were 20 grams or more (five-year minimum) and 100 grams or more (ten-year minimum). These quantities were somewhat greater than those enacted into law and reflected a 50-to-1 powder-to-crack quantity ratio. According to the report, the Subcommittee determined that the five- and ten-year mandatory sentencing scheme would create the

proper incentives for the Department of Justice to direct its "most intense focus" on "major traffickers" and "serious traffickers." "One of the major goals of this bill is to give greater direction to the DEA and the U.S. Attorneys on how to focus scarce law enforcement resources." *Id.* The Subcommittee defined major and serious traffickers as follows:

**major traffickers**: "the manufacturers or the heads of organizations who are responsible for creating and delivering very large quantities;" H.R. Rep. No. 845, 99th Cong., 2d Sess. pt. 1, at 16-17 (1986).

**serious traffickers**: "the managers of the retail level traffic, the person who is filling the bags of heroin, packaging crack cocaine into vials . . . and doing so in substantial street quantities." *Id.*

The Subcommittee directed staff to consult "with a number of DEA agents and prosecutors about distribution patterns of drugs which if possessed by an individual would likely be indicative of operating at such a high level." *Id.* After consulting with law enforcement professionals but without holding hearings, the Subcommittee set specific quantity levels for the entire range of illegal drugs, including powder and crack cocaine, that would trigger the five- and ten-year mandatory minimum penalties and that generally would be associated with major and serious traffickers. The Subcommittee report indicated that the bill's crack cocaine penalty triggers were set to fit into the major/serious trafficker scheme. In other words, the framework was to apply to crack cocaine in the same way as other drugs. At a mark-up of H.R. 5394, Congressman Hughes stated:

The quantity is based on the minimum quantity that would be controlled or directed by a trafficker in a high place in the processing and distribution chain. . . . For the major traffickers, the levels we have set [include] . . . 100 grams of cocaine freebase . . . The Narcotics Penalties and Enforcement Act: Markup on H.R. 5394 Before the Subcomm. on Crime of the Senate Comm. on the Judiciary, 99th Cong., 2d Sess. 131 (1986) (Statement of Rep. Hughes). Chairman Hughes added that the "serious trafficker" definition applied to dealers selling quantities of 20 grams of cocaine base.

As the 1986 Act quickly advanced through the legislative process in late summer and early fall, the Senate increased the powder cocaine-to-crack ratio to 100-to-1. Statements of individual Senators suggest that this augmentation was motivated principally by the perceived heightened harmfulness of crack and that the five- and ten-year mandatory minimum sentences ultimately were equated with those trafficked crack quantities that Congress believed would warrant at least the prescribed minimum sentence. For example, Senator Lawton Chiles, a leader in the effort to achieve stringent crack penalties, explained that:

This legislation will . . . decrease the amount for the stiffest penalties to apply. Those who possess 5 or more grams of cocaine freebase will be *treated as* serious offenders. Those apprehended with 50 or more grams of cocaine freebase will be *treated as* major offenders. Such treatment is absolutely essential because of the especially lethal characteristics of this form of cocaine. (*emphasis added*) 132 Cong. Rec. 26,447 (Sept. 26, 1986).

At the same time, the Act's general mandatory minimum penalty scheme continued to be explained by a number of congressional leaders (for example, by Senator Byrd, *supra*) in terms of a correlation between quantities of each of the major street drugs (including crack) and the relative culpability of the typical trafficker involved with those quantities in drug trafficking organizations. Taken as a whole, the abbreviated, somewhat murky legislative history simply does not provide a single, consistently cited rationale for the crack-powder cocaine penalty structure.

**4. The Role of the Media and Public Opinion**

As stated above, the 1986 Act was notable for the speed of its development and enactment. *See* 132 Cong. Rec. 31,329 (Oct. 15, 1986) (statement of Sen. Chiles) ("it is historical for the Congress to be able to move this quickly"); 132 Cong. Rec. 26,449 (Sept. 26, 1986) (statement of Sen. Rockefeller) ("I know it seems to some that we are moving too fast and frenetically to pass drug legislation."). Some members were critical of the speed with which the bill was considered. *See, e.g.*, 132 Cong. Rec. 26,462 (Sept. 26, 1986) (statement of Sen. Mathias) ("Very candidly, none of us has had an adequate opportunity to study this enormous package. It did not emerge from the crucible of the committee process."); 132 Cong. Rec. 22,658 (Sept. 10, 1986) (statement of Rep. Lott) ("In our haste to patch together a drug bill - any drug bill - before we adjourn, we have run the risk of ending up with a patch-work quilt . . . that may not fit together into a comprehensible whole."). Congressional urgency is chronicled in the legislative history. Drug abuse in general, and crack cocaine in particular, had become in public opinion and in members' minds a problem of overwhelming

dimensions.

Recalling recent drug-related deaths of the Boston Celtics' first-round basketball draft pick, Len Bias, and Don Rogers of the Cleveland Browns professional football team, members of Congress repeatedly described the dimensions of the drug problem in such dramatic terms as "epidemic." *E.g.*, 132 Cong. Rec. 26,436 (Sept. 26, 1986) (Statement of Sen. Biden); 132 Cong. Rec. 26,444 (Sept. 26, 1986) (Statement of Sen. Deconcini); 132 Cong. Rec. 8,091 (June 20, 1986) (Statement of Sen. D'Amato); 132 Cong. Rec. 8,092 (June 20, 1986) (Statement of Sen. Mattingly). Against this background, Senator Hawkins spoke in support of the 1986 Act, reflecting the sentiment for urgent legislation:

Drugs pose a clear and present danger to America's national security. If for no other reason we should be addressing this on an emergency basis . . . This is a bill which has far-reaching impact on the future as we know it as Americans and as we mature into the next century. 132 Cong. Rec. 26,436 (Sept. 26, 1986).

The media played a large role in creating the national sense of urgency surrounding drugs, generally and crack cocaine specifically. Whether the media simply reported an urgent situation or rather itself created an exigency has been and will continue to be debated. What is clear, however, is that the crack problem in the United States coincided with large-scale print media and network news coverage of crack.

Crack cocaine was first mentioned in the media by the Los Angeles Times on November 25, 1984, referring to a cocaine "rock" that was appearing in the barrios and ghettos of Los Angeles. The New York Times first mentioned crack in a story on November 17, 1985. The coverage increased and intensified over time. In the months leading up to the 1986 elections, more than 1,000 stories appeared on crack in the national press, including five cover stories each in Time and Newsweek. NBC news ran 400 separate reports on crack (15 hours of airtime). C. Reinarman and H. Levine, "The Crack Attack: Politics and Media in America's Latest Drug Scare," in J. Best (Ed.), Images of Issues: Typifying Contemporary Social Problems 117 (1989). Time called crack the "Issue of the Year" (September 22, 1986). Newsweek called crack the biggest news story since Vietnam and Watergate (June 16, 1986). CBS News aired a documentary entitled "48 Hours on Crack Street."

Some assertions made in these reports were not supported by data at the time and in retrospect were simply incorrect. One report in 1986, for example, labeled crack cocaine as "America's drug of choice." At the time, however, there were no prevalence statistics on the use of crack. *Id.* at 121. The first statistics on crack cocaine use compiled by NIDA subsequent to the report showed that snorting powder cocaine was still the preferred method of ingestion by 95 percent of cocaine users. *Id.*

Another example is the coverage surrounding the death of Len Bias in June 1986. Bias died of cocaine intoxication the day after he was the second player drafted in the National Basketball Association's college draft in 1986. The method of cocaine ingestion that killed Bias was not known at the time of his death. Nonetheless, following Bias's death, newspapers across the country ran headlines and stories containing a quote from Dr. Dennis Smyth, Maryland's Assistant Medical Examiner, that Bias probably died of "free-basing" cocaine. Newspapers that ran such headlines included the Los Angeles Times, USA Today, the Chicago Tribune, The Atlanta Constitution, and the Washington Post. Dr. Smyth based his assertion on the fact that there were high concentration levels of cocaine in Bias's bloodstream. The previous week, however, Dr. Yale Caplan, a toxicologist in Maryland's Medical Examiner's Office said that the test of cocaine found in the vial at the scene "probably was not crack." And Maryland's Chief Medical Examiner, Dr. John E. Smialek, stated that the evidence suggests that Bias snorted cocaine due to the residue of cocaine in the nasal passages. Dr. Smyth's assertions, however, received the bulk of the coverage.

A few weeks after Bias's death, on July 15, 1986, the United States Senate's Permanent Subcommittee on Investigations held a hearing on crack cocaine. During the debate, Len Bias's case was cited 11 times *See* transcript of the "Crack Cocaine" hearing before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate, 99th Congress. in connection with crack. Eric Sterling, who for eight years served as counsel to the House Judiciary Committee and played a significant staff role in the development of many provisions of the Drug Abuse Act of 1986, testified before the United States Sentencing Commission in 1993 that the "crack cocaine overdose death of NCAA basketball star Len Bias" *See* testimony of Eric Sterling before the United States Sentencing Commission on proposed guideline amendments, public comment, March 22, 1993. was instrumental in the development of the federal crack cocaine laws. During July 1986 alone, there were 74 evening news segments about

crack cocaine, many fueled by the belief that Bias died of a crack overdose. Reinarman and Levine, *supra* note 42, at 117.

Not until a year later, during the trial of Brian Tribble who was accused of supplying Bias with the cocaine, did Terry Long, a University of Maryland basketball player who participated in the cocaine party that led to Bias's death, testify that he, Bias, Tribble, and another player snorted powder cocaine over a four-hour period. Tribble's testimony received limited coverage.

### 5. The Anti-Drug Abuse Act of 1988

Congress further underscored its concern about drugs generally, and crack cocaine specifically, in the Anti-Drug Abuse Act of 1988. Pub. L. No. 100-690, 102 Stat. 4181 (1988). The most far-reaching change of the Anti-Drug Abuse Act of 1988 applied the same mandatory minimum penalties to drug trafficking conspiracies and attempts that previously were applicable only to substantive, completed drug trafficking offenses. Furthermore, with respect to crack cocaine, the Act amended 21 U.S.C. 844 to make crack cocaine the only drug with a mandatory minimum penalty for a first offense of simple possession. The Act made possession of more than five grams of a mixture or substance containing cocaine base punishable by at least five years in prison. The five-year mandatory minimum penalty also applies to possession of more than three grams of cocaine base if the defendant has a prior conviction for crack cocaine possession, and to possession of more than one gram of crack if the defendant has two or more prior crack possession convictions.

### a. Congressional Intent Surrounding Crack Cocaine Possession Penalties

As originally introduced, the 1988 bill did not contain mandatory minimum penalties for possession of cocaine base. Rather, the penalties were added by floor amendments in both the House and in the Senate. *See* 134 Cong. Rec. H.7,704 (Sept. 16, 1988) (Statement of Rep. Shaw); 134 Cong. Rec. S17,320 (Oct. 21, 1988) (Statement of Sen. Helms). Relatively little debate surrounded the proposals to attach mandatory minimum penalties to cocaine base possession. Nevertheless, adoption of the proposals clearly signaled that the congressional concern over crack cocaine had continued and perhaps even increased since enactment of the 1986 Anti-Drug Abuse Act.

The 1988 Act's mandatory minimum penalties single out cocaine base possession in a manner that is much more severe than possession penalties for other serious controlled substances. Under the Act - and under today's law - simple possession penalties for cocaine base compared to any other drug are as follows:

> possession of any quantity of any other drug - whether heroin, powder cocaine, or any
> other controlled substance - results in a maximum penalty of one year in prison;

cocaine base possession of between one and five grams, depending on criminal history, results in a minimum penalty of five years in prison. The Act established an anomaly in current law whereby persons with prior convictions for crack cocaine possession under 21 U.S.C. 844(a) who have now been caught with up to five grams of crack cocaine, have an incentive to bargain with the prosecutor for a plea to trafficking offenses (*e.g.*, a violation of 21 U.S.C. 841) to avoid the possession mandatory minimum penalty that would otherwise apply. The anomaly results because trafficking traditionally has been considered a more serious offense than simple possession.

Because there was little debate on the amendments establishing the mandatory minimum cocaine base possession penalties, statements on the floor of the House and Senate by proponents provide the clearest indication of congressional intent. It should also be noted that the Department of Justice opposed the amendments. *See e.g.*, 134 Cong. Rec. H7705 (Sept. 16, 1988) (statement of Rep. Rangel). In debating the amendments, three reasons were given by proponents for singling out possession of crack cocaine for severe penalties. 134 Cong. Rec. S17,301 (Oct. 21, 1988).

First, it was argued that the supply of "cocaine" *Id. See also, e.g.*, 134 Cong. Rec. H7,704 (Sept. 16, 1988) (statement of Rep. Hunter) ("There is so much crack that we . . . are creating users because the supply is so prevalent."). was greater than ever. Second, it was argued that crack cocaine "causes greater physical, emotional, and psychological damage than any other commonly abused drug." *Id*. Finally, repeating the concern expressed during consideration of the 1986 Act, it was argued that "crack [cocaine] has been linked to violent crime." *Id*. Of particular note was the connection between the crack cocaine trade and gang activity. *See, e.g.*, 134 Cong. Rec. E2,701 (Aug. 10, 1988) (statement of Rep. Miller). A

strong emphasis was placed on the possession penalties as a means of aiding the enforcement community's efforts against crack cocaine traffickers by setting up a presumption that possession of five grams of crack cocaine meant the possessor was a trafficker. It was thought that possession of as little as five grams of crack cocaine was an indicator of distribution rather than personal use. Letter from Senator Jesse A. Helms to William Wilkins, Jr., Chairman, United States Sentencing Commission (May 15, 1989) (on file with the United States Sentencing Commission).

Finally, although not necessarily with reference to the cocaine base simple possession mandatory minimum penalties, members voiced notable concern during debate on the 1988 Act over a harm that was not discussed widely during consideration of the 1986 Act: the increase in cocaine-exposed infants due to crack cocaine use. *See, e.g.,* 134 Cong. Rec. E2,933 (Sept. 14, 1988) (statement of Rep. Vento); 134 Cong. Rec. E2,701 (Aug. 10, 1988) (statement of Rep. Miller); 134 Cong. Rec. S17,320 (Oct. 21, 1988) (statement of Sen. Helms). This concern led to a provision in the drug bill to establish demonstration projects to provide prevention, education, and treatment to substance-abusing pregnant women. 134 Cong. Rec. E2,933 (Sept. 14., 1988) (statement of Rep. Vento).

## D. FEDERAL SENTENCING GUIDELINES AND COCAINE PENALTIES

Pursuant to the Sentencing Reform Act, the United States Sentencing Commission created sentencing guidelines. The guideline system was designed to provide certainty and fairness in sentencing and to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct. *See* 28, U.S.C., 991. To achieve these objectives best, the Commission created a guideline system that looks, in part, at a defendant's actual conduct rather than just the offense of conviction. *See* U.S. Sentencing Commission, <u>Guidelines Manual</u> 1-10 (1994). Details of how this system applies to cocaine offenders is provided in Chapter 7.

In setting the appropriate penalty levels for drug offenses, the Commission began by adopting the five- and ten-year mandatory minimum sentences set out in the 1986 Anti-Drug Abuse Act, and the quantities associated with these mandatory minimum sentences, as reference points. "The Commission has used the sentences provided in, and equivalencies derived from, the statute (21 U.S.C.

841(b)), as the primary basis for the guideline sentences." *Id.* at 2D1.1, comment. (n.10). Trafficking in 50 grams of crack or 5 kilograms of powder cocaine, offenses that carry a ten-year mandatory minimum term of imprisonment pursuant to statute, were assigned offense level 32, an offense level corresponding to a guideline range of 121-151 months for a defendant in Criminal History Category I. Trafficking in 5 grams of crack or 500 grams of powder, offenses that carry a five-year mandatory minimum term of imprisonment, were assigned offense level 26, an offense level corresponding to a guideline range of 63-78 months for a defendant in Criminal History Category I.

Using the above two reference points, the offense guidelines were expanded proportionally in two-level increments, upward and downward, to address trafficking in larger and smaller quantities of crack and powder cocaine. The 100-to-1 quantity ratio was maintained throughout the offense levels. Thus, powder cocaine offenses were assigned offense levels from level 12, for offenses involving 25 grams or less, to level 42, for offenses involving 1,500 kilograms or more. *Id.* at 2D1.1(c) (Drug Quantity Table). Amendment 505, effective November 1, 1994, specified level 38 as the highest offense level corresponding to drug quantity; however, the presence of other aggravating factors (*e.g.,* possession of a dangerous weapon) may increase the offense level above level 38. Crack offenses were assigned offense levels from level 12, for offenses involving 250 milligrams or less, to offense level 42, for offenses involving 15 kilograms or more. *Id.*

## E. THE FEDERAL ENFORCEMENT ROLE TODAY

Within the Departments of Justice, Treasury, Transportation, Defense, and State and the U.S. Postal Service, there are numerous agencies with operational and law enforcement responsibilities for drug control. These include, for example, the Drug Enforcement Administration, the Federal Bureau of Investigation, the United States Attorneys, the Immigration and Naturalization Service, the United States Marshals Service, the United States Customs Service, the Bureau of Alcohol, Tobacco and Firearms, the United States Coast Guard, and the Federal Aviation Administration. Defining the federal role in drug enforcement among and between these agencies and the myriad of state and local law enforcement agencies is difficult at best.

The Office of National Drug Control Policy was created to set forth a strategy to coordinate the federal, state, and local efforts to achieve drug control best. The current strategy defines the federal role in law enforcement. Because federal sentencing policy significantly impacts on this strategy, the strategy is discussed below. In addition, because the Drug Enforcement Administration is the primary drug enforcement agency, its strategic approach is briefly outlined as an example of a federal agency's role. The strategic roles discussed here have been defined by these agencies with respect to the drug problem generally and not with respect to individual drugs.

### a. Office of National Drug Control Policy

The Anti-Drug Abuse Act of 1988 created the Office of National Drug Control Policy ("ONDCP") in the Executive Office of the President. The Act charged the Director of ONDCP with coordinating all national drug control policy, with jurisdiction extending to both supply and demand control. The Act requires ONDCP to publish a national strategy for drug control based on quantifiable goals, to advise the National Security Council on drug control policy, to recommend management, personnel, and organizational changes necessary to implement drug control strategy, and to consult with state and local governments.

In February 1994, ONDCP published its current National Drug Control Strategy. In it, ONDCP specifically defines the federal enforcement role in overall drug law enforcement. The National Drug Strategy also outlines the federal anti-drug role in areas other than enforcement. These other areas include providing financial and technical support for drug prevention, drug treatment, and alternative sentencing programs like boot camps, providing money for additional state and local police, and regulating firearms purchases. The White House, Office of National Drug Control Policy, <u>National Drug Control Strategy</u> 36-46 (Feb. 1994).

The National Drug Control strategy outlines the federal enforcement role as follows:

The Federal role in drug law enforcement includes (1) aggressively pursuing those enforcement efforts that target the major international and inter-State drug enterprises; (2) providing leadership, training, technical assistance, and research; (3) fostering cooperation among Federal, State, and local agencies; and (4) facilitating State and Local enforcement and criminal justice efforts and/or innovative drug control approaches. *Id*.

According to the ONDCP strategy, "[t]argeting the major trafficking organizations will continue to be the top priority of Federal drug law enforcement authorities." As the top priority, the Attorney General and the Secretary of the Treasury are developing a comprehensive investigative plan to ensure integration of efforts by all relevant agencies. Part of the investigative policy outlined by ONDCP includes "the kingpin and enterprise strategies" that are designed to ensure that federal enforcement efforts are focused on major drug trafficking organizations. These strategies target criminal organizations that transport and distribute drugs across state lines as well as those that transport drugs into the United States. *Id*.

In addition, federal law enforcement agencies are permitted to assist states and localities through participation in joint task forces such as the Organized Crime Drug Enforcement Task Forces "when the needs of the community, the state, or the region are best served by such efforts." These task forces are meant to "support States and localities as they define and improve their criminal justice system." The task forces, and federal enforcement efforts generally, target gangs and other organizations that cause violence in communities regardless of the quantity of drugs distributed by the organizations.

Although such gangs may deal in a volume of drugs lower than that typically seen in Federal drug cases, several factors make Federal participation in State and local investigations and prosecution appropriate and necessary. These include the multi-State nature of gang operations, the potential violation of immigration laws by many of these groups, their involvement in violations of Federal firearms laws, and the threat their violence poses to local communities. Thus, efforts to control the gang problem will be a focus of our national antidrug efforts. *Id*.

The National Drug Strategy also calls for continued federal involvement in border interdiction and in capturing those involved in money laundering and drug-related financial crimes.

### b. Drug Enforcement Administration

In November 1993, the Drug Enforcement Administration (DEA) issued a Strategic Management System, outlining the agency's policies and priorities for the upcoming year. Consistent with the National Drug Control Strategy, DEA's Strategic Management System lays out the following priorities: (1) incapacitating leaders and important players in major international and interstate drug trafficking organizations; (2) disrupting the production of illegal drugs; (3) preventing the diversion of controlled substances; (4) controlling the chemicals used to manufacture illegal drugs; (5) supporting interdiction efforts; and (6) seizing and forfeiting assets derived from drug trafficking. U.S. Department of Justice, Drug Enforcement Administration, <u>Strategic Management System: FY 1994</u> (Nov. 1993).

To achieve these goals, the Strategic Management System delineates three specific responsibilities for DEA. First, DEA is to lead federal drug law enforcement by conducting, managing, and coordinating major investigations and international operations. As part of this responsibility, DEA has implemented the Kingpin Strategy, "DEA's primary enforcement effort focusing on the identification and targeting of drug Kingpins and their supporting infrastructure." Second, DEA is to coordinate and disseminate drug intelligence. For example, DEA manages the National Narcotics Intelligence System, collecting, analyzing, and disseminating drug-related intelligence. Finally, it is DEA's responsibility to share its experience and to provide investigative support to state and local enforcement agencies. DEA's State and Local Task Force Program is the primary vehicle by which DEA provides a federal presence at the state and local law enforcement levels. *Id*.

## F. STATE LEGISLATIVE ACTION

To place federal legislative actions in context, the Sentencing Commission surveyed the laws of the 50 states, the District of Columbia, the Virgin Islands, and Puerto Rico The Commission also surveyed research literature and drug policy experts to determine if the crack cocaine problem is international in scope and whether other countries distinguish crack cocaine from powder cocaine in their criminal laws. Both the literature and the experts suggested that there is no comparable crack cocaine problem outside the United States, although Canada has a significant crack problem. Further, neither the literature nor the experts cite a foreign country that differentiates crack and powder cocaine in its criminal laws Unless otherwise indicated, this chapter's use of the term "state" hereafter signifies the states and territories contacted for the survey. distinguish between crack cocaine and powder cocaine. The Commission reviewed relevant state statutes and guideline provisions. In addition, the Commission contacted each state sentencing commission or its counterpart if the state had such an agency. Otherwise, the Commission surveyed the state agency responsible for collecting criminal justice data (*e.g.*, statistical analysis centers).

In addition to collecting information on cocaine penalties, the Commission sought information regarding the following:

- whether the state uses sentencing guidelines (either advisory or mandatory);
- whether state guidelines distinguish between crack cocaine and powder cocaine;
- whether state sentences are determinate or whether early release through parole is available;
- whether the state has enacted mandatory minimum drug statutes; and
- whether the state compiles data on crack cocaine's impact on the prison population, on crack cocaine use and violence, or on crack cocaine's relative impact on prosecutorial caseloads. Information related to data collection was not available for all states.

### 1. Statutory Distinctions Between Crack Cocaine and Powder Cocaine

Because a primary focus of this report is the significant distinction made in federal statutes between powder cocaine and crack cocaine, the Commission researched whether state statutes distinguish between powder cocaine and crack cocaine. As of the date of this report, 14 states have some form of distinction between crack and powder cocaine in their statutory schemes. Following is a summary of the manner in which each of these states distinguishes between the two forms of cocaine.

It must be noted that depending on the state, the sentence actually served by an offender may be a small fraction of the sentence meted out by the state court. This is true for many reasons, most notably, prison capacity and whether parole is a feature of the state's law. The data on actual time served for defendants were not available to the Commission at the time of this report.

### a. Alabama

Although Alabama does not provide different penalties for crack and powder cocaine crimes, it uses a 10-to-1 quantity ratio for determining eligibility for its diversion program. Penalties for cocaine crimes are determined by the quantity of cocaine involved. There is no separate mention of cocaine base or crack cocaine in these provisions. Alabama Code 13A-12-231(2) (1993). However, the statutory provisions outlining eligibility for the diversion of offenders to drug treatment rather than prosecution provide different quantity levels for powder cocaine and crack cocaine offenders. If the substance involved in the offense was powder cocaine, the quantity cannot exceed five grams for eligibility for diversion. If the substance was crack cocaine, the quantity cannot exceed 500 milligrams (one-half gram).

### b. California

In California, individuals convicted of possession or possession with intent to sell crack cocaine and powder cocaine are sentenced to different terms. Crack cocaine defendants are sentenced to a three-, four-, or five-year term of imprisonment, while powder cocaine defendants are sentenced to a lesser two-, three-, or four-year term. In California, prison sentencing ranges comprise three possible terms: normal, aggravating, and mitigating. For example, the "normal" defendant convicted of crack cocaine possession receives a four-year term. If aggravating circumstances exist, the defendant receives a five-year term. And if mitigating circumstances exist, he/she receives a three-year term. *See* California Health and Safety Code 11350, *et seq.* California statutes provide enhancements if large quantities of drugs are involved in the offense. However, when calculating the quantity levels necessary to trigger these enhancements, California does not distinguish between crack and powder cocaine.

### c. Connecticut

Connecticut differentiates between the two forms of cocaine. The Connecticut statutes set a penalty of 5-20 years to life for trafficking in one ounce or more of cocaine powder. The same penalty applies for trafficking in .5 gram or more of cocaine base. The powder/crack quantity ratio is thus 56.7-to-1. Connecticut General Statutes Annotated 21a-278(a) (West Supp. 1993).

### d. District of Columbia

The District of Columbia criminal code differentiates between cocaine base and cocaine powder. It provides a five-year term for a first offense and a ten-year term for a second offense involving trafficking in various amounts of controlled substances. The threshold amount of cocaine powder for these terms is 500 grams. District of Columbia Code Annotated 33-541(c)(1)(A) *et seq.* The threshold amount for offenses involving cocaine base is 50 grams (a 10-to-1 ratio). However, another code section that establishes specific mandatory minimum penalties for cocaine offenses The District of Columbia provides penalties for cocaine powder and cocaine base in two statutory provisions. provides that if these threshold amounts are met, the minimum terms are four, seven, and ten years, respectively, for a first, second, third, or subsequent offense involving cocaine base. The minimum terms are higher, at five, eight, and ten years, respectively, for a first, second, third, or subsequent offense involving cocaine powder.

### e. Iowa

Iowa employs a 100-to-1 ratio in distinguishing between powder cocaine and crack cocaine. Unlike the federal statutes, however, this ratio is not reflected in the threshold amounts that trigger the mandatory minimum penalties. Rather, the 100-to-1 quantity ratio is reflected in the threshold amounts that determine the <u>maximum</u> statutory penalty. In other words, a defendant must have 100 times more powder cocaine than another defendant trafficking in crack cocaine in order to trigger the same statutory maximum penalty.

### f. Louisiana

Louisiana differentiates between powder cocaine and cocaine base but not through a quantity ratio. The Louisiana statutes provide a sentencing range of 5-30 years for trafficking in any amount of a narcotic drug (which includes cocaine powder) and a sentencing range of 20-50 years for trafficking in any amount of cocaine base. Louisiana Revised Statutes Annotated 40:967(B)(1) *et seq.*

### g. Maryland

The Maryland criminal code provides for a five-year mandatory minimum penalty for trafficking in controlled substances. The mandatory minimum is triggered in cases involving 448 grams of cocaine powder or 50 grams of cocaine base. Maryland Annotated Code art. 27, 286(f)(1) *et seq.* Maryland does not differentiate punishment ratios for offenses involving bringing a narcotic into the state. In addition, Maryland has a "drug kingpin" statute providing more severe penalties for an offender who meets the statutory definition. Generally, a person is considered a drug kingpin if the offense involved specified quantities of controlled substances. The statute provides different amounts for offenses involving various controlled substances including cocaine, but provides no separate penalties for cocaine base offenses.

### h. Missouri

The Missouri statutes provide that offenses involving more than 150 grams but less than 450 grams of cocaine powder are Class A felonies. An offense involving 450 grams or more is a Class A felony for which the offender may not receive probation or parole. The quantities that trigger these same sentences for offenses involving cocaine base are more than two but less than six grams, and six or more grams, respectively. Missouri Annotated Statutes 195.222(2.).

### i. Nebraska

Nebraska sets penalties generally based on the schedule of controlled substance involved in the offense. An offender is subject to punishment for a Class IC felony when seven or more ounces of powder cocaine are involved in the offense or 28 grams of cocaine base. The quantity ratio is thus 7.1-to-1. Nebraska Revised Statutes 28-405.

### j. North Dakota

Following the federal regime, North Dakota uses a 100-to-1 quantity ratio. The criminal code provides for increased penalties in offenses involving 500 grams of cocaine powder or 5 grams of cocaine base. Sections 19-03.1-23.1(c)(2) and (3). Unlike the federal system, however, below these threshold quantities, all controlled substances listed in the same schedules are treated alike.

### k. Oklahoma

Oklahoma also differentiates between the two forms of cocaine, using roughly a 6-to-1 ratio. The Oklahoma statutes provide ten-year mandatory minimum penalties for offenses involving 28 grams of cocaine powder or 5 grams of cocaine base. Oklahoma Statutes Annotated Tit. 63, 2-415(C)(2). The statutes also provide a 20-year mandatory minimum for offenses involving 300 or more grams of cocaine powder or 50 grams or more of cocaine base.

### l. South Carolina

South Carolina's statutory scheme for cocaine penalties is complex. South Carolina Code Annotated 44.53-370, 44.53-375 (1992 Supp.). There are separate offenses for possession, distribution, and trafficking of cocaine base and powder cocaine with different minimum and maximum penalties. The penalties for distribution of cocaine powder are more stringent than those for crack: 5-30 years for a first offense involving the distribution of cocaine powder and 15-30 years for a second offense as compared to 0-25 years for a first offense involving the distribution of cocaine base and 0-30 years for a second offense. South Carolina's statutory scheme formerly provided several punishments for offenses involving cocaine base that were significantly <u>lower</u> than those for offenses involving cocaine powder. The current statutory scheme is a result of deliberate attempts to equalize penalties for offenses involving these two forms of cocaine. However, there is also a separate statute that directs sentences for particular quantities of cocaine involved in the case within the larger minimum and maximums. These sentencing ranges are based on the same quantities for cases involving both crack and powder cases. There are also different maximum penalties for offenses involving possession, with those for cocaine base being somewhat higher than those for cocaine powder: for example, for a first offense, crack cocaine possession has a statutory maximum of five years, while powder cocaine possession has a two-year maximum.

### m. Virginia

In Virginia, there is no statutory distinction between powder cocaine and cocaine base, generally. The penalties are determined by the schedule of the controlled substance involved in the offense, and all cocaine forms and derivatives are placed in schedule II. Virginia Code Annotated 18.2-248 (1993 Supp.). However, Virginia recently enacted a "drug kingpin" statute that provides a 20-year mandatory minimum (with a maximum of life) for offenders who qualify as "drug kingpins" by trafficking in specified quantities of various substances. The "kingpin" level for trafficking in powder cocaine is 500 kilograms, and the level for cocaine base is 1.5 kilograms. This results in a 333-to-1 quantity ratio for those offenders prosecuted as drug kingpins.

### n. Wisconsin

In Wisconsin, drug weight ratios of crack cocaine to powder cocaine vary depending on the quantity of drugs. For example, three grams or less of crack cocaine triggers a one-year mandatory minimum sentence, while 25 to 100 grams of powder cocaine trigger the same penalty. A three-year mandatory minimum penalty is mandated in offenses involving 3 to 10 grams of crack cocaine, compared to 100 to 400 grams of powder cocaine. The five-year mandatory penalty is implicated by 10 to 40 grams of crack and 400 to 800 grams of powder cocaine. Finally, more than 40 grams of crack cocaine triggers the ten-year mandatory minimum penalty compared to more than 800 grams of powder cocaine.

### o. The Remaining States

The remaining states do not distinguish statutorily between crack cocaine and powder cocaine.

### 2. Sentencing Guidelines

State criminal penalties are best understood with an awareness of a state's sentencing structure. As part of its survey, the Commission asked whether states had sentencing guideline systems and whether imposed sentences were determinate (*i.e.*, sentence imposed is the sentence served) or indeterminate (*i.e.*, sentence or sentence range imposed with release into the community after service of less than the full sentence). The results of this survey are presented in Table 4.

Twenty-one states employ some form of sentencing guidelines. Some state guidelines are advisory/voluntary, while others are "mandatory." Twenty states have determinate sentencing structures, some in combination with guidelines, some not. At the current time, four states with existing guideline systems, Wisconsin, Maryland, Louisiana, and Virginia, distinguish between cocaine powder and cocaine base in their guidelines. Ohio's proposed guidelines, which have passed the state house and are expected to pass the state senate sometime in 1995, would distinguish between powder cocaine and crack cocaine at a ratio that varies from 2-to-1 to as high as 10-to-1. In Ohio, the legislature thus far has chosen not to distinguish between cocaine powder and cocaine base in the statutory scheme. There is considerable variation in statewide sentencing schemes. For example, only two of the states with statutes that distinguish between cocaine powder and cocaine base have determinate sentencing. One of these, Louisiana, employs some form of guidelines system; the other, Connecticut, does not. Consequently, little can be said about how varied sentencing structures affect the presence or absence of a distinction between crack cocaine and powder cocaine in the actual sentence served by the offender.

### 3. Mandatory Minimum Sentences

The Commission surveyed the states on the prevalence of mandatory minimum drug penalties in order to examine the relationship between such penalties and sentencing distinctions made between crack cocaine and powder cocaine. If states did not distinguish between crack cocaine and powder cocaine, the Commission sought to determine whether, nevertheless, they had enacted mandatory minimum penalties for drug offenses.

Table 4 shows that 32 states have mandatory minimum penalties for one or more types of drug offenses (*e.g.*, trafficking, repeat trafficking, repeat possession, and sale of drugs within a certain distance of a protected area such as a school or playground). Most of these states base their minimum penalties on the quantity of drugs for which the defendant is held accountable. All of the states that distinguish between powder cocaine and crack cocaine also have mandatory minimum penalties, except Nebraska.

**4. Referral Policies**

In addition to determining the ways in which states distinguished between crack cocaine and powder cocaine, the survey sought information about whether the federal statutes' harsher penalties for crack cocaine affected a state's decision to refer crack cases to the federal system for prosecution. States cited three primary reasons for referring a crack cocaine case to federal prosecutors:

Table 4, page 1

Table 4 page 2

involvement of a large amount of drugs (18 states);

involvement of federal authorities in the investigation (15 states); and

opportunity for asset forfeiture where the state had no power to seek such forfeiture (6 states).

The federal system's 100-to-1 quantity ratio was not specifically cited as a reason to refer cases to federal prosecutors. However, several respondents stated that if the drug amounts were above the thresholds for federal mandatory minimum penalties, the state would refer the case to federal prosecutors.

**5. Impact of Crack Cocaine on State Criminal Justice Systems**

As part of the survey, states were asked if they collected empirical data on the number of crack cocaine cases in their state's criminal justice system. The Commission was interested in learning whether the distribution of drug cases at the state level is similar to that of the federal system, and whether states could provide data on crime associated with drug offenses.

Only three states were able to provide statistics on the number of crack cocaine cases and their impact on prosecutorial caseloads. Responses varied widely. For example, 50 percent of South Carolina's drug cases involve crack cocaine. In Minnesota, 17.3 percent of the drug cases involve crack. In Virginia, 18.3 percent of the state's drug convictions were for crack cocaine, compared to 52.8 percent for powder cocaine.

None of the states could provide specific data or any correlation between crack cocaine use and violence. Many respondents provided anecdotes that revealed particular views on these issues, but no quantifiable data. This lack of data may be due to the fact that the majority of states do not distinguish between crack cocaine and powder cocaine for penalty or recordkeeping purposes.

**G. THE IMPACT OF PROSECUTORIAL AND INVESTIGATORY DISCRETION ON COCAINE OFFENDERS AND SENTENCES**

Discretion exercised by prosecutors and investigators working on cocaine cases can have a significant impact on sentences for any individual cocaine offender. While the exercise of discretion by prosecutors and investigators has an impact on sentences in almost all cases to some extent, because of the 100-to-1 quantity ratio and federal mandatory minimum penalties, discretionary decisions in cocaine cases often have dramatic effects.

**1. Prosecutorial Discretion**

Federal law enforcement and judicial resources are limited. The federal criminal justice system cannot process all the cases involving violations of federal law. The FBI's Uniform Crime Reports estimate that state and local law enforcement agencies made almost 1.1 million arrests for drug abuse violations in 1990. During the same period, DEA made 21,799 arrests. Nearly all of these arrests, both state and federal, involve violations of both state and federal law. Some of these arrests make their way to the federal system, others to the state (and some were prosecuted in both systems).

Table 5 shows the number and percentage of drug trafficking cases sentenced in the various federal districts and circuits. There are some surprising variations in prosecution practices. The largely rural district of Central Illinois

sentenced a considerably higher proportion of crack cocaine cases than the Chicago-driven district of Northern Illinois. Brooklyn, New York, reports a much lower proportion of federal crack sentencings than Northern and Southern West Virginia, though New York City Police Department data show that 45.8 percent of all drug arrests in 1989 were crack cocaine-related. Steven R. Belenko, Crack and the Evolution of Anti-Drug Policy (1993), at 118. In 1993 the state of South Carolina had more crack cocaine cases (118) than the states of Colorado, Kansas, New Mexico, Oklahoma, Utah, and Wyoming combined (113).

Specific examples further illuminate the impact of prosecutorial discretion. In the Central District of California, which includes Los Angeles, the United States Attorney's Office has stated in court documents that it generally does not prosecute crack cases involving less than 50 grams of crack. United States v. Washington, et al., CR 91-632-TJH (C.D. Ca. 1993), Declaration of Assistant United States Attorney David C. Scheper attached to Government's Opposition to Defendant's Motion To Dismiss Re: Selective Prosecution. This is borne out by Sentencing Commission data that show only four sentencings for drug trafficking in 1993 for quantities of crack below 50 grams in this district. The result of this policy is that those defendants involved in quantities below the 50-gram threshold are prosecuted in state court and are subject to less severe sentences. R. Berk, "Preliminary Data on Race and Crack Charging Practices in Los Angeles," 6 Federal Sentencing Reporter 36-38 (1993).

By contrast, U.S. Attorney's Offices that do not have this policy frequently prosecute defendants who fall below the 50-gram threshold. For example, in the District of Columbia in 1993,

Table 5, page 1

Table 5 page 2

Table 5 page 3

111 defendants were sentenced for trafficking less than 50 grams of crack cocaine. The United States Attorney's Office in the District of Columbia has recently changed its policy so that crack cases involving less than 50 grams generally are not prosecuted in federal court. Similarly, in the Southern District of West Virginia, 97 defendants were sentenced for trafficking less than 50 grams of crack. Because the sentencing guidelines at these levels are tied proportionately to the federal mandatory minimum penalties, these defendants are punished more severely than their counterparts in Los Angeles.

Certainly, resource limitations or differing state/federal priorities may restrict the prosecution of crack cases in larger federal districts and help to explain why some of the smaller, more rural federal districts have experienced larger numbers of crack prosecutions. The Commission does not mean to suggest that any apparent disparities are unwarranted. We have not analyzed various factors that might explain these differences, including the strength of the state and local law enforcement efforts directed at the crack cocaine trade, the relative punishment available through state statutes, or the differing needs and problems facing each district.

Most important from the Commission's perspective, the discretion exercised in determining which arrests end up in which system can have a dramatic effect on the ultimate sentence for a particular defendant. Federal courts in 1990 sentenced drug traffickers to an average of 84 months in prison. Under federal law, the vast majority of these sentences are actually served. U.S. Department of Justice, supra note 7. A convict's sentence may be significantly reduced on motion of the government if the convict substantially assists the government in the investigation or prosecution of another person who has committed an offense. By contrast, according to the Department of Justice, state courts in 1988 sentenced drug traffickers to an average maximum sentence of 66 months in prison. Id. Of the maximum 66 months, the Department of Justice's Bureau of Justice Statistics estimated that, on average, 20 months, or roughly 30 percent, were actually served.

**2.Investigatory Discretion**

As discussed earlier in this report and documented in the next chapter, generally only retail and small wholesale distributors traffic in crack, while those higher in the distribution chain are involved with the powder form. Obviously, somewhere within this chain someone converts the powder to crack. When an offender is discovered above the conversion level, whether the investigator ties the offender to those lower in the distribution chain can have a dramatic

impact on the sentence.

For example, if a DEA agent uncovers a person with no criminal history distributing one kilogram of powder cocaine and makes an arrest, that person is subject to roughly a five-year sentence based on the quantity of controlled substance. If the distributor converts that same quantity of cocaine to crack, (perhaps at the agent's suggestion) At least one district court has found this practice unconstitutional. *See* <u>United States v. Shepherd</u>, 857 F.Supp. 105 (D.D.C. 1994). the resulting sentence is roughly 15 years.

*United States Sentencing Commission*

**NEWS**
Press Releases and News Advisories
Congressional Testimony and Reports

**INTERACTIVE SOURCEBOOK**

**TRAINING**
Online Learning Center
CLE
Training Opportunities
Annual National Training Seminar
Case Law Information
Primers

**ABOUT**
Overview of the USSC
About the Commissioners
Rules of Practice and Procedure

**EMPLOYMENT**

**GUIDELINES MANUAL**
Proposed Amendments
Current Version
Archives

**RESEARCH AND PUBLICATIONS**
Annual Reports and Sourcebooks
Federal Sentencing Statistics
Quick Facts
Commission Datafiles
Prison and Sentencing Impact Assessments
Retroactivity Analyses and Data Reports
Research Publications
Research Projects and Surveys
Working Group Reports
Materials Related to United States v. Booker
Topical Index of Publications

**AMENDMENT PROCESS**
Federal Register Notices
Public Hearings and Meetings
Public Comment
"Reader-Friendly" and Official Text of Amendments
Materials on 2014 Drug Guidelines Amendment
Materials on Federal Cocaine Offenses

**ADVISORY GROUPS**
Practitioners Advisory Group
Probation Officers Advisory Group
Tribal Issues Advisory Group
Victims Advisory Group

**CONTACT US**



**U.S. Sentencing Commission**
Office of Public Affairs
One Columbus Circle, NE
Suite 2-500, South Lobby
Washington, DC,
20002-8002
Main: (202) 502-4500
Helpline: (202) 502-4545
E-mail:
PubAffairs@ussc.gov

Sitemap
Privacy and Security
Related Links
Employment
Contact Us
Follow Us